# BROTHERHOOD OF LOCOMOTIVE ENGINEERS ET AL. *v.* CHICAGO, ROCK ISLAND & PACIFIC RAILROAD CO. ET AL.

No. 69.   Argued December 8–9, 1965.—Decided January 31, 1966.*

---

*Together with No. 71, *Hardin et al.* v. *Chicago, Rock Island & Pacific Railroad Co. et al.,* also on appeal from the same court.

*James E. Youngdahl* argued the cause for appellants in No. 69. With him on the briefs was *Eugene F. Mooney*. *Jack L. Lessenberry* argued the cause for appellants in No. 71. With him on the brief was *Bruce Bennett,* Attorney General of Arkansas.

*Robert V. Light* and *Dennis G. Lyons* argued the cause for appellees in both cases. With them on the brief were *Thurman Arnold, W. J. Smith, H. H. Friday* and *R. W. Yost.*

Briefs of *amici curiae,* urging reversal, were filed by *Bronson C. La Follette,* Attorney General, and *Beatrice Lampert,* Assistant Attorney General, for the State of Wisconsin; by *John J. O'Connell,* Attorney General, and *Frank P. Hayes, James R. Cunningham* and *Paul*

*Coughlin,* Assistant Attorneys General, for the State of Washington; and by the following Attorneys General for their respective States: *Arthur K. Bolton* of Georgia, *John J. Dillon* of Indiana, *Jack P. F. Gremillion* of Louisiana, *Forrest H. Anderson* of Montana, *Frank L. Farrar* of South Dakota, and *Waggoner Carr* of Texas.

Briefs of *amici curiae,* urging affirmance, were filed by *William P. Rogers, Robert M. Lane, Gerald E. Dwyer, Victor F. Condello, Jordan Jay Hillman, Joseph S. Gill* and *Woodrow L. Taylor* for Associated Railways of. Indiana et al., and by *Francis M. Shea, Richard T. Conway, William H. Dempsey, Jr., Ralph J. Moore, Jr., James R. Wolfe* and *Charles I. Hopkins, Jr.,* for the National Railway Labor Conference.

Opinion of the Court by MR. JUSTICE BLACK, announced by MR. CHIEF JUSTICE WARREN.

Appellees, a group of interstate railroads operating in Arkansas,. brought this action in a United States District Court asking that court to declare two Arkansas statutes unconstitutional and to enjoin two Arkansas Prosecuting Attorneys, appellants here, from enforcing or attempting to enforce the two state statutes. The railroad brotherhoods, also appellants here, were allowed to intervene in the District Court in order to defend the validity of the state statutes. One of those statutes, enacted in 1907, makes it an offense for a railroad operating a line of more than 50 miles to haul freight trains consisting of more than 25 cars without having a train crew consisting of not "less than an engineer, a fireman, a conductor and three brakemen . . . ."[1] The second statute challenged by the railroads, enacted in 1913, makes it an offense for any railroad operating with lines 100 miles or more

---

[1] Ark. Laws 1907, Act 116, Ark. Stat. Ann. §§ 73–720 through 73–722 (1957).

in length to engage in switching activities in cities of designated populations, with "less than one [1] engineer, a fireman, a foreman and three [3] helpers. . . ." [2] The complaint charged that, as applied to the plaintiff railroads, both statutes (1) operate in an "arbitrary, capricious, discriminatory and unreasonable" manner in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment; (2) unduly interfere with, burden and needlessly increase the cost of interstate commerce in violation of the Commerce Clause, Art. I, § 8, cl. 3, of the Constitution, and contrary to the National Transportation Policy expressed in the Interstate Commerce Act; (3) discriminate against interstate commerce in favor of local or intrastate commerce; and (4) by seeking to regulate and control the number of persons working on interstate railroad locomotives and cars invade a field of legislation pre-empted by the Federal Government primarily through federal enactment of Public Law 88–108 passed by Congress in 1963.[3] This law was passed to avert a nationwide railroad strike threatened by a labor dispute between the national railroads and the brotherhoods over the number of employees that should be used on trains.

In their complaint the railroads admitted that this Court had on three separate occasions, in 1911,[4] in 1916,[5] and again in 1931,[6] sustained the constitutionality of both state statutes against the same Fourteenth Amendment and Commerce Clause challenges made in the

---

[2] Ark. Act 67·of 1913, Ark. Stat. Ann. §§ 73–726 through 73–729 (1957).

[3] 77 Stat. 132, 45 U. S. C. following § 157 (1964 ed.).

[4] *Chicago, R. I. & P. R. Co.* v. *Arkansas,* 219 U. S. 453.

[5] *St. Louis, I. M. & S. R. Co.* v. *Arkansas,* 240 U. S. 518.

[6] *Missouri Pac. R. Co.* v. *Norwood,* 283 U. S. 249, 290 U. S. 600. See also latter case below, 13 F. Supp. 24.

present action. The complaint alleged, however, that improvements have now been so great in locomotives, freight cars, couplers, brakes, trackage, roadbeds, and operating methods that the facts on which the prior holdings rested no longer exist. The brotherhoods and the two defendant Prosecuting Attorneys answered the complaint asserting the constitutionality of the Acts and denying that there had been a change in conditions so significant as to justify any departure from this Court's prior decisions. The brotherhoods' answer alleged that modern developments had actually multiplied the dangers of railroading thus making the Arkansas statutes more necessary than ever. The pleadings therefore, at least to some extent, presented factual issues calling for the introduction and determination of evidence under prior holdings of this Court. See, *e. g., Southern Pacific Co.* v. *Arizona,* 325 U. S. 761. At this stage of the trial, however, the railroads, claiming there was no substantial dispute in the evidence with reference to any relevant issues, filed a motion for summary judgment under Rule 56, Fed. Rules Civ. Proc. alleging that: (1) Both state statutes are "pre-empted by federal legislation in conflict therewith, to-wit: Public Law 88–108 and the award of Arbitration Board No. 282 pursuant thereto; the Railway Labor Act . . . ; and the Interstate Commerce Act . . . particularly the preamble thereto"; (2) the state statutes constitute discriminatory legislation against interstate commerce in violation of the Commerce Clause; and (3) the state statutes deny the railroads equal protection of the laws in violation of the Fourteenth Amendment. Without hearing any evidence the three-judge court convened to consider the case sustained the railroads' motion for summary judgment, holding, one judge dissenting, that the Arkansas statutes are "in substantial conflict with Public Law 88–108 . . . and the proceedings thereunder, and are therefore unenforce-

able against the plaintiffs . . . ." 239 F. Supp. 1, 29. The District Court did not purport to rule on the other questions presented in the motion for summary judgment and the complaint. We noted probable jurisdiction, 381 U. S. 949.

A few weeks ago this Court held in *Swift & Co.* v. *Wickham, ante,* p. 111, that an allegation that a state statute is pre-empted by a federal statute does not allege the unconstitutionality of the state statute so as to call for the convening of a three-judge court under 28 U. S. C. § 2281 (1964 ed.). Thus, under *Swift,* the pre-emption issue in this case standing alone would not have justified a three-judge court, and hence would not have justified direct appeal to us under 28 U. S. C. § 1253 (1964 ed.). The complaint here, however, also challenged the Arkansas statutes as being in violation of the Commerce, Due Process, and Equal Protection Clauses. In briefs submitted to us after oral argument the appellants have argued that all these constitutional challenges are so insubstantial as a matter of law that they are insufficient to make this an appropriate case for a three-judge court. We cannot accept that argument. Whatever the ultimate holdings on the questions may be we cannot dismiss them as insubstantial on their face. Nor does the fact that the pre-emption issue alone was passed on by the District Court keep this from being a three-judge case. Had all the issues been tried by the District Court and had that court enjoined enforcement of the state laws on pre-emption alone, we would have had jurisdiction of a direct appeal to us under 28 U. S. C. § 1253 (1964 ed.). *Florida Lime & Avocado Growers, Inc.* v. *Jacobsen,* 362 U. S. 73. The same is true here where the state laws were enjoined on the basis of pre-emption but the other constitutional challenges were left undecided. Thus we have jurisdiction and so proceed to the merits.

## I.

We first consider the question of pre-emption. Congress unquestionably has power under the Commerce Clause to regulate the number of employees who shall be used to man trains used in interstate commerce. In the absence of congressional legislation on that subject, however, the States have extensive power of their own to regulate in this field, particularly to protect the safety of railroad employees and the public. This Court said in *Missouri Pac. R. Co.* v. *Norwood,* one of the previous decisions upholding the constitutionality of these Arkansas statutes, that:

> "In the absence of a clearly expressed purpose so to do Congress will not be held to have intended to prevent the exertion of the police power of the States for the regulation of the number of men to be employed in such crews." 283 U. S., at 256.

See also the same case, 290 U. S. 600.

In view of *Norwood* and the two preceding cases, all of which sustained the constitutionality of the Arkansas statutes over charges of federal pre-emption, the question presented to this Court is whether in adding the 1963 compulsory arbitration Act to previous federal legislation, Congress intended to pre-empt this field and supersede state legislation like that of Arkansas, or, stated another way, whether application of the Arkansas law "would operate to frustrate the purpose of the [1963] federal legislation." *Teamsters Union* v. *Morton,* 377 U. S. 252, 258.

Since the railroad unions first gained strength in this country the problem of manning trains has presented an issue of constant dispute between the railroads and the unions. Some States, such as Arkansas, believing perhaps that many railroads might not voluntarily assume the expense necessary to hire enough workers for their

trains to make the operations as safe as they could and should be, passed laws providing for the minimum size of the train crews. Where these laws were not in effect the question of the size of the crews was settled by collective bargaining, though not without great difficulty. It was this sensitive and touchy problem which brought on the explosive collective bargaining impasse that triggered the 1963 Act which the railroads now contend was intended to permanently supersede the 1907 and 1913 Arkansas statutes. Such a permanent supersession would, of course, amount to an outright repeal of the statutes by Congress.

The particular dispute which eventually led to the enactment of Public Law 88–108 began in 1959 when the Nation's major railroads notified the brotherhoods that they considered it to be the right of management to have the unrestricted discretion to decide how many employees should be used to man trains, and that they did not intend to submit that subject to collective bargaining in the future. The brotherhoods protested, serving counter-proposals on the railroads. As a result the representatives of each side met to try to negotiate a new collective bargaining agreement. On the question of the size of the crews the negotiators stuck and would not budge. The railroad negotiators insisted that changed conditions, particularly the substitution of diesel and electrically propelled engines for steam engines, had made firemen completely unnecessary employees. They continued to insist that the railroads should be left free to decide for themselves when and how many firemen should be used, if any at all. Throughout all negotiations, and up to now, the brotherhoods have insisted that a fireman is needed even on a diesel engine, particularly to aid the engineer as a lookout for safety purposes, and to help make needed repairs and adjustments while the train is moving, should the engine for any reason fail to function. Agreement on

this question proving impossible in the 1959 negotiations, President Eisenhower, acting at the request of both sides, appointed a Presidential Commission to try to adjust the dispute. After long investigation and consideration the Commission reported. Its report was unsatisfactory to the brotherhoods, not wholly satisfactory to the railroads, and did not result in any settlement. The dispute dragged on. Another report was made by the President's Advisory Committee on Labor-Management Policy but it also failed to bring about an agreement.

All efforts at agreement having failed, President Kennedy, on July 22, 1963, reported to Congress that on July 29 the railroads "can be expected to initiate work rules changes . . . . And the brotherhoods thereupon can be expected to strike." "This Nation," he said, "stands on the brink of a nationwide rail strike that would, in very short order, create widespread economic chaos and distress." Pointing out the disastrous consequences that might occur to the country should a strike take place, the President recommended legislation to provide "for an interim remedy while awaiting the results of further bargaining by the parties." He recommended that "for a 2-year period during which both the parties and the public can better inform themselves on this problem . . . interim work rules changes proposed by either party to which both parties cannot agree should be submitted for approval, disapproval or modification to the Interstate Commerce Commission in accordance with the procedures and provisions of section 5 of the Interstate Commerce Act . . . ." President Kennedy repeatedly emphasized to the Congress his hope that the dispute could eventually be settled by collective bargaining. He stated his belief that advances in railroad technology had made it necessary to reduce the railroad labor force, but he insisted that the public should help bear the burden of this reduction in order that it not fall entirely on those em-

ployees who would lose their jobs. He warned the Congress that it was highly necessary " 'for workers to enjoy reasonable protection against the harsh effects of too sudden change.' " In his message the President expressed no desire to have Congress pass a law that would finally and completely dispose of the problem of the number of men who should man the crew of a train, but instead warned that "It would be wholly inappropriate to make general and permanent changes in our labor relations statutes on this basis" and that any " 'revolutionary changes even for the better carry a high price in disruption . . . (that) might exceed the value of the improvements.' " Thus the President's message did not in any way indicate a purpose on his part to disturb the existing pattern of full-crew laws by supersession of them, either temporarily or permanently.

Congress enacted the bill proposed by the President with one significant change. He had recommended that a binding determination of the issues not resolved by collective bargaining be made by the Interstate Commerce Commission. At least one brotherhood witness testified before the Senate Commerce Committee to an apprehension that the Interstate Commerce Commission if given the power requested would declare States' full-crew laws superseded by orders of the Commission.[7] Subsequent to this both the House and Senate Committees dropped a section of the proposed bill that would have vested power in the Commission to make binding settlements.[8] Instead of that section the Act passed by Congress provided for establishment of an arbitration board to consist of seven members, two appointed by the railroads, two by the unions and three to be appointed by the President

[7] Hearings before Senate Committee on Commerce on S. J. Res. No. 102, 88th Cong., 1st Sess., 629.

[8] S. Rep. No. 459, 88th Cong., 1st Sess., 9.

should the four members named by the railroads and unions fail to agree among themselves on an additional three. The arbitration board was given power to resolve the dispute over the firemen and full-crew questions. Their award was to be a complete and final disposition of these issues for a period not exceeding two years from the date the awards would take effect. Awards were made by such a board which the railroads now claim call for supersession of the state laws. We hold that neither the Act itself nor the awards made under it can have such an effect.

The text of the Act and the awards made under it contain no section specifically pre-empting the States' full-crew laws nor is there any specific saving clause indicating lack of intent to pre-empt them. Appellees argue, however, that the terms of the Act and the awards are inconsistent with the operation of the state laws and thus the laws are no longer valid. But Congress wanted to do as little as possible in solving the dispute which was before it, and we note that this dispute was not over the size of crews in States which had full-crew laws, for there the size of crews was regulated by statute and not by collective bargaining agreements. The railroads made this very point before the Senate Commerce Committee when a spokesman for three railroads, in commenting on the few jobs that would be lost if the brotherhoods accepted the railroads' proposal, said, "25.9 percent of the firemen positions in freight and yard service must be maintained because of the provisions of so-called full-crew laws of the States of [listing 13 States including Arkansas]." [9] It appears, therefore, that Congress did not need to pre-empt the state laws in order to eliminate this collective bargaining impasse, and further examina-

---

[9] Hearings before the Senate Committee on Commerce on S. J. Res. No. 102, 88th Cong., 1st Sess., 707.

tion of the legislative history of Public Law 88–108 confirms our view that Congress had no intention of superseding the state full-crew laws by passage of that Act.

The President's proposal was interpreted and explained to the House Committee on Interstate and Foreign Commerce by the Secretary of Labor. On the subject of state full-crew laws he told that Committee:

> "I call attention to such statements as those of the *Missouri Railroad Company* v. *Norwood*, the Supreme Court case in 1930 in which the Court said, 'In the absence of a clearly stated purpose so to do Congress will not be held to have intended to prevent the assertion of the police power of the States for the regulation of the number of men to be employed in such crews.' It would be the intention reflected here that the issuance of an interim ruling, subject to termination in a time period or at the agreement of the parties, would not have the effect of affecting any State full crew law." [10]

The Chairman of the House Committee on several occasions emphatically stated both in the hearings and on the House floor that the bill was not intended, either as proposed or as passed, to supersede state laws. On one occasion he said:

> "This issue was raised in the course of the hearings before the committee. Questions were asked of the various people representing management and the labor industry and witnesses representing the labor brotherhoods, the employees' representatives, and the Secretary of Labor. It was made rather clear in the course of the hearings that it would in no way affect the provisions of State laws. The committee in executive session discussed the question

---

[10] Hearings before the House Committee on Interstate and Foreign Commerce on H. J. Res. No. 565, 88th Cong., 1st Sess., 78.

and concluded that it was not the intent of the committee in any way to affect State laws. On page 14 of the committee report we included, in order that this history might be made, this language: 'The committee does not intend that any award made under this section may supersede or modify any State law relating to the manning of trains.' " [11]

The Chairman of the Committee then went on to tell the House, after referring to this Court's holding in *Missouri Pac. R. Co.* v. *Norwood,*

"Therefore, since this bill does not mention the subject of State laws, and since, as the committee report shows, we do not intend to affect these laws, I am confident they are not affected by the bill.

"I think that is about as clear as we can make it."

Many statements like those quoted above point to the fact that both the Senate and the House members did not intend by enacting Public Law 88–108 to supersede state laws. This sentiment was voiced by witnesses representing both labor and railroads as well as by public officials of the Nation. The railroads seek to offset these carefully considered expressions by reference to a single incident. On one of the occasions when Representative Harris, Chairman of the House Committee reporting the bill, had stated that the Act would not supersede the state law, Representative Smith of Virginia, Chairman of the Rules Committee of the House, interrupted Representative Harris to make the statement set out below.[12]

---

[11] 109 Cong. Rec. 16122 (1963). See also the Committee Report referred to by Chairman Harris, H. R. Rep. No. 713, 88th Cong., 1st Sess., 14.

[12] "Mr. SMITH of Virginia. Mr. Speaker, the colloquy between the gentleman from California [Mr. SISK], and the chairman of the Committee on Interstate and Foreign Commerce, the gentleman from Arkansas [Mr. HARRIS], raises a question that has not previously been discussed on the floor of the House. It was discussed in the

436

This single statement by Congressman Smith was hardly enough to cast doubt in the minds of the members of the House as to the accuracy of the statement made by Congressman Harris, Chairman of the Committee which reported the bill. The substance of Congressman Smith's statement was:

"I think the provisions of the Constitution are such and the decisions of the courts are such that there is no way in which a State can overcome the power of the Federal Government under the interstate commerce clause."

---

committee yesterday before the Committee on Rules. I do not like to remain silent in view of the statement that a State law can overcome the constitutional provision which gives exclusive jurisdiction to the Federal Government in matters of interstate commerce. I do not know what precedents may have been found with reference to this question, but of course, in the matter of purely intrastate commerce under our Constitution the State, of course, would have authority, but when it comes to dealing with interstate commerce I think the provisions of the Constitution are such and the decisions of the courts are such that there is no way in which a State can overcome the power of the Federal Government under the interstate commerce clause.

"I simply wanted to make my own position clear with reference to that question, for whatever it may be worth.

"Mr. EDMONDSON. Mr. Speaker, will the gentleman yield?

"Mr. SMITH of Virginia. I yield to the gentleman from Oklahoma.

"Mr. EDMONDSON. I thank the distinguished chairman of the Committee on Rules for yielding to me at this point. Would this not mean in effect that about the only kind of train operation in which State laws would prevail would be in the switching of cars involving switch engine operations?

"Mr. SMITH of Virginia. Of course, it is just a question of what is or what constitutes interstate commerce. Now, as you know, the decisions of the courts and the actions of the Congress have gone a long way in putting almost everything under interstate commerce." 109 Cong. Rec. 16122 (1963).

This statement was, of course, correct but it has little relevance as to whether the bill was intended to exercise the power of the Federal Government to supersede state laws.

In the face of the clear congressional history of this Act we could not hold that either the Act itself or the arbitration awards made under it supersede the Arkansas state laws.

## II.

The railroads contend that the District Court would have been justified in holding the two Arkansas Acts unconstitutional on the second ground of their motion for summary judgment which is that the two Acts "constitute discriminatory legislation against interstate commerce in favor of intrastate commerce." Aside from the fact that such an argument was apparently rejected in the prior cases upholding the constitutionality of the Arkansas statutes we think it is wholly without merit. The argument is based on the fact that the 1907 state law exempts railroads with less than 50 miles of track and the 1913 law exempts railroads with less than 100 miles of track. None of the State's 17 intrastate railroads have more than 50 miles of track. It turns out that none of them are subject to either of the two state laws while 10 of the 11 interstate railroads are subject to the 1907 Act and eight of them are subject to the 1913 Act. It is impossible for us to say as a matter of law that this difference in treatment by the State, based on the differing mileage of railroads, is without any rational basis as the railroads contend. Certainly some regulations based on different mileage of railroads might be wholly rational, reasonable, and desirable. We cannot say on the record now before us that classification according to the length of mileage in these two statutes constitutes discrimination against interstate commerce in violation of the Com-

merce Clause or the Equal Protection Clause. See *Florida Lime & Avocado Growers, Inc.* v. *Paul,* 373 U. S. 132, 137.

The judgment of the District Court is reversed and the cause is remanded to that court for consideration of the constitutional issues left undecided by its previous judgment.

*It is so ordered.*

MR. JUSTICE FORTAS took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, dissenting.

We all agree that Congress has ample power to regulate the number of employees used to man railroad trains operating in interstate commerce. Unlike the majority, however, I believe that Congress has exercised that power, and respectfully dissent from the Court's conclusion to the contrary.

The bargaining impasse which prompted the passage of Public Law 88–108 (77 Stat. 132) represented, in a sense, only the exposed top of a large iceberg. Lurking beneath the surface of the controversy were the twin problems of automation and technological unemployment. Congress was well aware of the developing conflict between innovation and job security. When President Kennedy sought a legislative solution to the pending crisis in the railroad industry, he reminded Congress that:

".  .  . this dispute over railroad work rules is part of a much broader national problem. Unemployment, whether created by so-called automation, by a shift of industry to new areas, or by an overall shortage of market demand, is a major social burden.

.         .         .         .         .

"This problem is particularly but not exclusively acute in the railroad industry. Forty percent fewer

employees than were employed at the beginning of this decade now handle substantially the same volume of rail traffic. The rapid replacement of steam locomotives by diesel engines for 97 percent of all freight tonnage has confronted many firemen, who have spent much of their career in this work, with the unpleasant prospect of human obsolescence. . . . The Presidential Commission was established in part, it said, because of the need to close the gap between technology and work." (See Hearings before Senate Committee on Commerce on S. J. Res. 102, 88th Cong., 1st Sess., 11–12.)

The Presidential Railroad Commission to which President Kennedy referred was established by President Eisenhower's order in 1960,[1] and was charged with investigating the dispute which arose out of the railroads' proposed elimination of firemen on diesel engines, and the reduction of the number of other crew members, in freight and yard service. After an extensive study, the Commission issued its report containing detailed findings on all aspects of the dispute. The Commission's recommendations included the elimination of firemen on diesels in freight service and the reduction of the number of brakemen and switchmen. It recommended financial benefits for those separated from service.

This Presidential Railroad Commission was well aware that, however desirable might be a nationwide solution to the problem, the continued existence of state "full crew" laws made this impossible:

"[M]ost of the legislation of this kind was enacted prior to 1920. These laws apparently fail to envision modern railroad operations. We feel that our recommendations with respect to this issue should have nationwide application. We recognize that

---

[1] Executive Order No. 10891, Nov. 1, 1960.

there will be difficulty in applying the rule recommended by us in States where 'full crew' laws have been enacted. How the restriction of those laws may be lifted, however, is a matter which goes beyond our charge." [2]

Then came Public Law 88–108, § 3 of which empowers the Board to "resolve the matters on which the parties were not in agreement" and to make a binding award which "shall constitute a complete and final disposition of the . . . issues." Section 7 (a) lays down standards for the Board:

(1) "[T]he effect of the proposed award upon adequate and safe transportation service";

(2) "[T]he effect of the proposed award upon . . . the interests of the carrier and employees affected"; and

(3) "[D]ue consideration to the narrowing of the areas of disagreement which has been accomplished in bargaining and mediation."

Today the Court concludes that Congress sought only to shear off the visible portion of the iceberg, leaving the continued existence of state "full crew" laws as a bar to the resolution of these matters.

That the state statutes in question conflict with the federal arbitration awards is plain. Congress directed the National Arbitration Board to resolve the dispute as to the necessity of firemen on diesel freights and as to the minimum size of train and switching crews. The Board has declared that, in general, firemen are not to be required. And through local boards, the number of brakemen, switchmen, and helpers to be used in various operations is fixed.[3] These state laws, however, compel

---

[2] Report of the Presidential Railroad Commission (1962), at p. 64.

[3] The national award provided for the elimination of 90% of the firemen's jobs in each local seniority district, except that firemen would in all cases be required on yard locomotives lacking a "deadman" control. In addition, jobs had to be made available to fire-

the use of firemen in virtually all interstate operations and fix the size of train crews at levels usually exceeding those fixed by the local awards.[4]  States lacking such laws are, in light of the Court's decision, free to enact them and thereby, in effect, imperil Public Law 88–108 and the arbitration awards made under it.  This Court has held that a state statute must fall in the face of an inconsistent provision in a collective bargaining agreement negotiated pursuant to the command of federal law, *Teamsters Union* v. *Oliver*, 358 U. S. 283, even though Congress did not prescribe the particular terms of the agreement.  And see *California* v. *Taylor*, 353 U. S. 553. We have here something more than collective bargaining agreements.  These arbitration awards are binding directives, resolving a labor-management dispute, issued under the direction and authority of Congress.

The problems submitted to the Arbitration Board concerned primarily two central issues: (1) continued use of firemen on diesel-electric or electric locomotives which do not use steam power, and on which the work of firing

men retained in service pursuant to the employment protective provisions of the award which, in general, provided that any fireman with 10 years' seniority had to be retained either as a fireman or an engineer.  Firemen with between two and 10 years' seniority had to be retained in engine service or offered a comparable position.

As for brakemen and switchmen, the award established procedures for binding local arbitration whereby the number of other crew members might be fixed on a local basis, subject to certain employment protective conditions established by the national Board.  The applicable local awards for Arkansas railroad operations provide for two brakemen on main-line operations and one brakeman on branch-line operations.  In switching operations, the local awards provide, with certain exceptions, for one helper.

[4] Thus Arkansas law requires a fireman on every train, with certain exceptions, while the arbitration award permits abolition of 90% of the firemen's positions.  Arkansas requires three brakemen while the arbitration award requires no more than two.  Similar conflicts appear in respect to the yard operations.

boilers need not be performed; (2) the makeup or "consist" of train service crews in road and yard. These are matters recognized by the Board as governed in some States "by statute or administrative decision." Indeed, a resolution of them in many situations might involve overriding or disregarding conflicting local regulations. Any realistic view of the scope and nature of the impasse the parties had reached would necessarily endow the Board with power to resolve conflicts between what it deemed to be the desirable national policy on the one hand and conflicting state laws on the other.

The issues were far-reaching; they included questions in the realm of economics, of railroad technology, and of sociology. This was a controversy that years of collective bargaining, study, informed analysis, persuasion, and debate had not been able to resolve. The Board's seven members [5] held 29 days of hearings, received the testimony of more than 40 witnesses recorded in nearly 5,000 pages of transcript, examined more than 200 documentary exhibits, and made inspection trips to four railroad yards in the Chicago area. Its award [6] was concurred in by the two carrier members and dissented from by the labor members.[7] The opinion of the neutral members of the Board details the conclusions the panel reached. It states, as to the question of firemen, that:

> "although we think it clear that firemen are presently performing useful services, we agree with the

[5] The Chairman of the Board was Ralph T. Seward. The other two neutral members were Benjamin Aaron and James J. Healy. Representing the carriers were Guy W. Knight and J. E. Wolfe. Representing the labor organizations were H. E. Gilbert and R. H. McDonald.

[6] See note 3, *supra*.

[7] The carrier members, while "disappointed with certain of [the] provisions" of the award, noted the "care and diligence" which the Board had displayed in reaching its decision. The labor members contended that the Board had not been true to the congressional command and that its conclusions were erroneous.

[Presidential Railroad] Commission 'that firemen-helpers are not so essential for the safe and efficient operation of road freight and yard diesels that there should continue to be either a national rule or local rules requiring their assignment on all such diesels.' " [8]

The Board found, in respect to the other members of the train crew, that "the consist of crews necessary to assure safety and to prevent undue workloads must be determined primarily by local conditions. A national prescription of crew size would be wholly unrealistic." The Board established procedures for local arbitration of these issues. And, the Board added,

"It is clear from the evidence before us that the myriad of local arrangements has led to numerous inconsistencies in the manning of crews. It is equally clear that some of the existing rules, originating as they did more than a half-century ago, are anachronistic and do not reflect the present state of railroad technology and operating conditions."

---

[8] The opinion states that the "lookout function presently assigned to the fireman is also performed by the head brakeman in road freight service and by all members of the train crew in yard service. In the great majority of cases the lack of a fireman to perform the related functions of lookout and signal passing will not endanger safety or impair efficiency because these functions can be, as they are now, performed by other crew members."

The mechanical duties performed by firemen, the Board found, could in large part "be performed by the engineer while the locomotive is in service and by shop maintenance personnel at other times."

Finally, the Board found that relief of the engineer by the fireman is of critical importance only in the event of sudden incapacitation. "In road freight service the usual presence of the head brakeman in the cab obviates the need for a fireman in such an emergency."

The Board's concern with safety is apparent from a reading of the neutral members' opinion. As that opinion puts it:

"It may be fairly stated that concern with safety has pervaded this entire proceeding. It was apparent in the presentations and arguments by all the organizations and by the carriers, and was further emphasized by the inquiries which members of the Board directed to witnesses and counsel."

We are in no position, of course, to pass judgment on the work of the Arbitration Board, nor is it our function to do so. But it is apparent that this panel had the power and the tools to resolve the controversy. Its award constitutes a national solution to the question of firemen and establishes the procedures, already utilized in respect to these railroads operating in Arkansas, for resolution of the crew consist issue.

I conclude that the effect of Public Law 88-108 and the awards made pursuant to it was to supersede state "full crew" legislation. Of course, were the intent of Congress shown to be otherwise, that would be dispositive. Unlike the majority, I do not think that the bits and pieces of legislative debate cited in the Court's opinion can be regarded as a controlling statement of legislative intent. If anything, the legislative history of Public Law 88-108 suggests that Congress refused to accept the suggestion that, if it wished to avoid the supersession of state "full crew" laws, it should expressly say so.

The majority points to statements made by Congressman Harris, Chairman of the House Committee on Interstate and Foreign Commerce, to the effect that the bill would have no effect on state laws. But when he stated his conclusion on the floor of the House, he was immediately challenged by Congressman Smith, Chairman of the Rules Committee. Under the circumstances, it

seems inappropriate to regard Congressman Harris' views as wholly authoritative. The testimony of Secretary Wirtz, also referred to by the Court, was followed by a legal memorandum submitted by the Secretary. This memorandum suggests that the Interstate Commerce Commission would, under the proposed legislation, have the power to supersede state legislation, and that to avoid this the Commission might expressly provide to the contrary in its orders.[9]

The absence of an express disclaimer of intent to supersede state laws was called to the attention of Congress. Testifying before the House Committee, Secretary Wirtz did so.[10] The General Counsel of the Interstate Commerce Commission told the Committee that if "the Congress wants to be doubly certain, for example, that no such legal consequence follows it could be done" by expressly stating that no supersession is intended.[11] To this the Chairman responded:

> "I appreciate your very frank response, because I think it has sort of been left up in the air as to what

---

[9] See Hearings before House Committee on Interstate and Foreign Commerce on H. J. Res. No. 565, 88th Cong., 1st Sess., 112–113. The reference to the Interstate Commerce Commission was made, of course, because at that stage Congress was considering the legislation in the form proposed by the President, which contemplated resolution of the dispute by the Commission.

The report of the Committee reflects the view of its Chairman and states that state full-crew laws would not be superseded. H. R. Rep. No. 713, 88th Cong., 1st Sess., 14. It bears repeating that this position was challenged by Congressman Smith on the floor of the House. And it is also significant that the report of the Senate Commerce Committee (S. Rep. No. 459, 88th Cong., 1st Sess.) makes no mention of the pre-emption question, despite references to it in the Committee's hearings. See note 13 and accompanying text and note 14, *infra*.

[10] See Hearings before House Committee on Interstate and Foreign Commerce on H. J. Res. 565, 88th Cong., 1st Sess., 111.

[11] *Id.*, at p. 614.

the courts might do. There has been expression as to what is intended and what some might have thought but I think we also have to provide clarity wherever it is necessary in order that the Commission may have guidance in its effort to carry out the responsibility should it so be directed." [12]

The Commission's General Counsel testified to the same effect before the Senate Commerce Committee:

"If it were desired to make that absolutely certain, if that is the desire of Congress, it can be done by just a phrase . . . ." [13]

Despite this advice, Congress did not include a "saving" clause.[14]

---

[12] *Ibid.*

[13] Hearings before Senate Committee on Commerce on S. J. Res. No. 102, 88th Cong., 1st Sess., 401.

[14] The possibility that the bill would result in the supersession of state laws was noted at other points in the Senate Commerce Committee hearings. A representative of the Brotherhood of Locomotive Engineers testified:

"Mr. DAVIDSON. Mr. Chairman, I was just handed a note that I would like to read into the record, if I may.

"Senator PASTORE. All right.

"Mr. DAVIDSON. General Counsel for the ICC, at the House hearing today, stated if this bill passes, the Commission would have jurisdiction over States' minimum crew bills.

"Senator PASTORE. I don't want to pass any judgment on that. You have read it into the record. I will check that." *Id.,* at 478.

The General Counsel of the Railway Labor Executives' Association testified: "I certainly visualize that as a bare minimum the carriers will contend that the effect [of] orders of the Commission authorizing decreases in crew consist—either of enginecrew or traincrew—would operate to overrule full crew laws in those States that have them. Perhaps that explains the alacrity with which the carriers embraced the President's recommendation and endorsed it." *Id.,* at 629.

As stated by the District Court: "A complete review of the legislative history will reveal that some members of Congress thought

Congress was faced, at the time it enacted Public Law 88–108, with more than the threat of a crippling strike. It had before it the recommendations of the Presidential Railroad Commission. It had been told by the President of the seriousness of the problem of technological unemployment arising from automation. Congress responded by establishing a procedure for resolution of the railroad industry's pressing economic problem with ample consideration of the "safety" issue. It is inconceivable that Congress intended to solve only part of the problem when it directed the Arbitration Board to make a binding award which "shall constitute a complete and final disposition of the . . . issues."

In sum, I agree with District Court that, "There is nothing in the Act itself or in the history that indicates that the Congress intended to resolve this problem of national magnitude by legislation that would be effective in only some 30 states that do not regulate crew consists by law or administrative regulation." 239 F. Supp. 1, 23.

Although automation was a prime concern of the President and the Congress, the Court holds that the lawmakers cloaked their concern in such weasel-like words as not to reach the roots of the problem. With all respect, I dissent.

---

that the legislation would pre-empt state crew consist laws, and others thought it would not. It is perfectly clear that the Committees in both Houses had it brought effectively to their attention that the legislation might have a pre-empting effect, and if such pre-emption was not the desire and intention of the Congress, it should so expressly state in the bill. There was no such expression although the bill was amended in many other respects after the hearings before both Committees had been concluded." 239 F. Supp., pp. 22–23.