BANGOR AND AROOSTOOK RAILROAD COMPANY et al.,
Plaintiffs,

v.

BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN,
Defendant.

BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN,
Plaintiff,

v.

The NEW YORK CENTRAL RAILROAD COMPANY, Defendant.

Civ. A. Nos. 777-66, 784-66, 1686-66.

United States District Court
District of Columbia.

Sept. 7, 1966.

See also D.C., 255 F.Supp. 476.

Joseph L. Rauh, Jr., and Isaac N. Groner, Washington, D. C., for Brotherhood.

## OPINION

HOLTZOFF, District Judge.

In the case of Bangor & Aroostook Railroad Co. v. Brotherhood of Locomotive Firemen & Enginemen, the Brotherhood is moving for a preliminary injunction which, with the consent of counsel for the moving party, is being construed as an application for additional relief at the foot of the decree. In the case of Brotherhood of Locomotive Firemen & Enginemen v. New York Central Railroad Co., the plaintiff is moving for a preliminary injunction. The questions involved in the two applications are similar and overlap. The two matters have, therefore, been argued together.

The questions presented relate to the status of firemen who are given a certain permanency of tenure by Arbitration Award 282. It is not necessary to review all of the preliminaries.[1] Suffice it, however, to recall the fact that Award 282 of the Arbitration Board created by an Act of Congress enacted on August 28, 1963, 77 Stat. 132, provided that in freight and yard services all firemen, with the exception of ten percent of their number, could be dispensed with as unnecessary. In ten percent of the positions, which were to be determined in a manner provided in detail in the Award but which it is not necessary to summarize in the course of this proceeding, the firemen were to be retained. Admittedly, there is no dispute that in passenger service firemen have to be retained. The reason for the distinction between freight and passenger service is that while all parties concede that a moving locomotive must ordinarily have two men in its cab, the practice in freight service is for the head brakeman to be stationed in the locomotive and, therefore, the fireman becomes unnecessary.

Francis M. Shea and Richard T. Conway, Washington, D. C., for railroads.

---

1. Brotherhood of Locomotive Firemen and Enginemen v. Chicago, Burlington & Quincy Ry. Co., D.C., 225 F.Supp. 11; affirmed 118 U.S.App.D.C. 100, 331 F.2d 1020, cert. den. 377 U.S. 918, 84 S.Ct. 1181, 12 L.Ed.2d 187.

While ruling that ninety percent of the firemen in freight and yard service could be dispensed with, the Board nevertheless held that they might not be discharged forthwith. It provided for a process of attrition. All firemen, known as C(6) firemen, who had between two and ten years of service were to retain permanent tenure, subject to the right of the carrier to offer a comparable job to any member of this group. All firemen having more than ten years' seniority, known as C(7) firemen, were to have permanent tenure and could not be dispensed with until they either died, retired or resigned.

The question presented on the argument of these applications is what constitutes the permanency of tenure which is to be accorded to the C(6) and C(7) firemen. The nature of the tenure accorded to them is defined in the Award,

Paragraph D(2) of the Award provides in part as follows:

"Firemen (helpers) who remain on the active working lists of the carrier under the provisions of paragraph C (6) and C(7) of this Award shall have the right to work their turn as firemen (helpers) to the extent that positions as firemen (helpers) are available in their respective seniority districts."

And again, this paragraph provides that:

"Such firemen (helpers) shall have no right to jobs that the carrier may discontinue pursuant to the provisions of this Award if other employment in any class of engine service, for which they are qualified, is available to them in their respective seniority districts."

Obviously, the permanent tenure accorded to each fireman is not the right to remain on the same assignment or the same run for the rest of his active life. In fact, such an interpretation would not necessarily be in the best interests of the firemen, because trains are at times discontinued and the permanency of tenure should not be tied to any one particular train or run. The problem is the extent to which the protected firemen may be assigned to positions or tasks other than those that they were performing at the time of the expiration of the effective period of the Award.

■ As has been stated, there are certain positions that the railroads must fill. They must carry firemen on all passenger trains. They are required by the Award to maintain firemen on ten percent of the positions in the freight and yard service. In addition, in certain States laws known as "full crew" laws require that certain personnel be hired, even though such personnel could be dispensed with under the Award in the absence of such laws. The Supreme Court has held that the full crew laws supersede the Award *pro tanto*, Brotherhood of Locomotive Engineers v. Chicago, R. I. & P. R. Co., 382 U.S. 423, 86 S.Ct. 594, 15 L.Ed.2d 501.

■■ If a vacancy arises in one of the positions that the carrier must keep filled, the question is whether one of the protected firemen may be transferred by the carrier to such an assignment. The Court answers this question in the affirmative. We must construe the Award just as a statute or contract in accordance with the obvious intention of its framers. One of the purposes of the Award was to permit the railroads to dispense with firemen, but to do so gradually as a matter of protection to existing incumbents. It would defeat the purposes of the Award if the carriers were required to go out and hire additional firemen to fill positions that must be kept filled, when protected firemen are available and can be used for that purpose. Consequently, the Court is of the opinion that carriers may transfer C(6) or C(7) firemen to any position that has to be kept filled, when such a position becomes vacant by reason of death, resignation or retirement of its incumbent.

Naturally, such a transfer may be made only within the seniority district to which the transferred fireman is accredited. Also, it is hardly needless to say that the carrier must observe seniority. It may not pick any fireman at

random and transfer him. It must accord an opportunity for transfer to protected firemen in the order of their seniority, and if none of them desires to accept the assignment, then the carrier's right to make the transfer is restricted to the most junior fireman on the list.

The next problem is more complicated. To what extent may a carrier transfer a protected fireman from the position to which he has been assigned to another position which need not be kept filled? Specifically, as a supposititious case, suppose are are 50 firemen positions in a particular seniority district, of which 15 are of the type that must be filled. Suppose some of the remaining 35 gradually become abolished by the process of attrition due to death, resignation or retirement. May the carrier transfer a protected fireman to another position within that group? A cognate question is, may a carrier abolish some of the positions within that group and then transfer their incumbents to other positions in that category? This query is necessarily covered by paragraph D(2) of the Award, to which reference has already been made.

■ The problem is not a simple one. Paragraph D(2) provides that firemen who remain on the active working lists shall have the right to work their turn as firemen to the extent that positions as firemen are available in their respective seniority districts. The question arises whether the carrier, under this provision, may make certain positions unavailable by abolishing them. Some light is cast upon this question by the further provision in the same paragraph that firemen shall have no right to jobs that the carrier may discontinue, pursuant to the provisions of this Award, if other employment in any class of engine service for which they are qualified is available. That qualification seems to refer, however, to positions that the carrier discontinues or abolishes as a result of a vacancy arising due to death, resignation or retirement. The question would not be free from doubt and there might be ambiguity in these provisions

of the Award were it not for the fact that the Board has construed this Award and has passed upon the points that are presented to this Court for decision. Naturally, the Arbitration Board, under the Railway Labor Act, had the power to construe its own Award.

Question 43, submitted to the Board by the Brotherhood of Locomotive Firemen and Enginemen, and the answers thereto, read as follows:

"(a) Does a fireman-helper covered by C–6 or C–7 of the Award have the right to remain on or bid in any job as contemplated by the schedule rules that were effective before date of the Award, or can the carrier exercise the individual seniority of the employee under the Award?

"(b) May the carrier arbitrarily abolish blankable firemen-helper positions, thereby depriving C–6 and C–7 employees from work to which they would otherwise be entitled in accordance with existing schedule rules?"
Answer:

"Under the terms of Section II, Part D(2), the carrier has the right to determine which of the blankable fireman (helper) positions in a seniority district shall be made available to those firemen (helpers) who are covered by Parts C–6 and C–7 and are entitled to work as firemen (helpers). In the event of a decrease in the number of firemen (helpers) positions in freight or yard service due to a decrease in service requirements, C–6 or C–7 firemen (helpers) who are thus displaced may, if there is no other work available for them, exercise seniority to blankable positions which are designated by the carrier."

Question 1(f), submitted by the Southern Pacific to the Board, and Question 3, submitted by the Brotherhood, and the answers thereto, are as follows:

"It is the carrier's understanding that a blankable fireman (helper) position which has been blanked by a carrier need not be bulletined or otherwise made available to C–6 or C–7

firemen (helpers) for the exercise of their seniority (unless or until such position is re-established by the carrier), and that any agreement, rule, regulation, interpretation or practice prior to the effective date of the Award which is to the contrary has been modified by the Award. Is the carrier's understanding correct?"

"It is the position of the Brotherhood that blanking a fireman (helper) job can occur under the Award if, and only if, there is no fireman (helper) on the fireman (helper) seniority list available to fill a vacancy which develops, that is, that the blanking of a job should be dependent upon the prior exhaustion of individual seniority rights.

"Are the Brotherhood's assertion and position correct?"

Answer:

"The Brotherhood's contention that blanking a fireman (helper) job can occur under the Award if, and only if, there is no fireman (helper) on the fireman (helper) seniority lists available to fill a vacancy which develops is not correct. A blankable fireman (helper) position which has been blanked by a carrier need not be bulletined or otherwise made available to C–6 or C–7 firemen (helpers) for the exercise of their seniority (unless such position is re-established by the carrier). The rights of C–6 or C–7 firemen with respect to the re-establishment of such positions are governed by Section II, Part D of the Award."

Southern Pacific Question 1(b) to the Board is as follows:

"It is the carrier's understanding that blankable fireman (helper) positions are those in which a carrier, under the terms of Section II, Part B(5) of the Award, is not required to use firemen (helpers) 'except as may be necessary to provide jobs for firemen (helpers) whose employment rights are retained as provided in Parts C and D' of the Award. Is the carrier's understanding correct?"

Answer:

"The carrier's understanding is correct."

Southern Pacific Question 1(c):

"It is the carrier's understanding that a carrier has the right to blank, (i. e., to discontinue or abolish) any blankable fireman (helper) position which it determines should not 'be made available to those firemen (helpers) who are covered by Parts C–6 and C–7 and are entitled to work as firemen (helpers),' unless or until the establishment or re-establishment of such a position is necessary to provide employment of the kind required by the Award to a C–6 or C–7 fireman (helper) who remains on the active working lists of the carrier. Is the carrier's understanding correct?"

Answer:

"The carrier's understanding is correct."

In this connection it must be observed that while the Award was in effect it created a permanent tenure, which firemen are entitled to maintain and preserve. The limitations on that permanent tenure are contained in the Award. The Arbitration Board, under the Railway Labor Act, was clothed with the power to interpret the terms of its own Award. In other words, it had the power to construe the nature of the tenure that it was according to the protected firemen.

■ This conclusion does not detract from the fact that the Award has come to an end and is no longer effective. The vested rights that it created while it was effective are not thereby destroyed. It would be a very sad thing for the firemen if they were destroyed, because then the railroads would be in a position to discharge all the so-called protected firemen overnight. This they may not do under the Award.

■ It is clear under the interpretation of the Board that the carriers have to maintain enough positions to accord an opportunity for employment to all protected firemen within their seniority

districts. In other words, they are under no obligation to maintain any specific position, and that being so, they have a right to transfer a protected fireman from one position to another within the seniority district in order to exercise a right to abolish certain positions, as they choose, provided they retain enough to furnish employment to all the protected firemen on their active lists.

The Court realizes that some hardship and some detriment will result to some of the protected firemen under certain circumstances. There is some degree of protection, of course, in the requirement that in making transfers the order of seniority must be observed by the carriers. They may not select a particular fireman at random and transfer him irrespective of his seniority. They must have regard to seniority in the manner to which the Court has already referred in connection with transfers to positions that have to be filled.

A word should be said about transfers to hostler assignments. It is clear that hostlers are within the group of firemen and, therefore, hostler positions are positions to which transfers may be made. It is claimed, however, that occasions may arise, especially with men who have reached middle life, when an employee may be physically unable to do the work of a hostler although perfectly capable of fulfilling the duties of a fireman. The Court is of the opinion that if such a situation arises, the fireman should not be compelled to take a hostler assignment, because this would indirectly defeat the protected tenure that is accorded him by the Award. If a dispute arises as to whether a particular fireman is capable of carrying on the task of a hostler, it should be determined by an impartial medical examination or possibly by a Local Board.

The Court, as it has ruled heretofore, is not going to determine grievances of individual employees or disputes concerning specific cases. The principle of *forum non conveniens* would preclude doing so. The Court will not draw here to Washington the task of disposing of possible individual controversies in all other parts of the country. The Court is of the opinion that such controversies would constitute minor disputes within the jurisdiction of the National Railroad Adjustment Board. Title 45, Section 153, which in part governs the jurisdiction of the Board, provides in sub-section (h) that the First Division of the Board shall have jurisdiction over disputes involving train and yard service employees of carriers, that is, engineers, firemen, hostlers and outside hostler helpers, conductors and yard service employees. Sub-section (i) vests in the Board jurisdiction over disputes between an employee or a group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules or working conditions. In addition, by the Act of Congress approved June 20, 1966, Public Law 89–456, machinery was created for the appointment of Special Boards of Adjustment to resolve disputes otherwise referable to the National Board. Such local boards will, it is hoped, eliminate the delays that have occurred before the National Railroad Adjustment Board due to the volume of business with which that Board has been confronted.

The Court perceives no reason for granting any injunctive relief. It will, as it has done on prior occasions, render its decision in the form of a declaratory judgment setting forth the principles heretofore outlined in this oral opinion. These principles will govern the disposition of any controversy that may arise. If there is any dispute as to the application of any one of these principles to any particular situation, the matter can be referred locally either to the National Railroad Adjustment Board or to a Special Board of Adjustment created under the new statute.

Counsel may submit a proposed judgment in accordance with this decision.

This oral opinion will constitute the findings of fact and conclusions of law.