See also D.C.Cir., 420 F.2d 72, 75.

**BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN, Appellant,**

v.

**BANGOR AND AROOSTOOK RAILROAD COMPANY et al., Appellees.**

**BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN, Appellant,**

v.

**The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY et al., Appellees.**

**Nos. 20909, 20910.**

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 17, 1968.

Decided Feb. 28, 1969.

Mr. Joseph L. Rauh, Jr., Washington, D. C., with whom Messrs. John Silard, Isaac N. Groner, Washington, D. C., and Alex Elson, Chicago, Ill., were on the brief, for appellant.

Mr. Francis M. Shea, Washington, D. C., with whom Mr. Richard T. Conway, Washington, D. C., was on the brief, for appellees.

Before DANAHER,* BURGER and LEVENTHAL, Circuit Judges.

PER CURIAM:

This case presents a particular facet of the issues relating to the manning of diesel locomotive crews with firemen. The background and general legal significance of Public Law 88–108 and of the expiration of Award of Arbitration Board 282 (Award) are set forth in our *Akron* opinion.[1] *Akron* involved appeals from the District Court's judgment of

* Circuit Judge Danaher became Senior Circuit Judge on January 23, 1969.

1. Brotherhood of Railroad Trainmen v. Akron & Barberton Belt R. R. Co., 128 U.S.App.D.C. 59, 385 F.2d 581 (1967), cert. denied, 390 U.S. 923, 88 S.Ct. 851, 19 L.Ed.2d 983 (1968).

May 12, 1966, as to the firemen manning and crew consist rules in effect after the expiration of the Award. The instant appeals in the same consolidated cases relate to carrier actions that occurred after expiration of awards which were not before us in *Akron*.

Appellee Galveston Wharves (carrier) operates a single terminal or yard, located within one seniority district, which had five regularly assigned yard crews as of January 3, 1967. On that day this carrier posted a bulletin listing four firemen jobs which it proposed to abolish the next day. All of its crews had been listed during the period of the Award as crews on which, in the carrier's judgment, firemen were not needed, and one of them had been designated, in effect vetoed, by appellant Union, the BLFE. Ordinarily, under the principles set forth in *Akron*, this would plainly have established work rules, continuing in effect after expiration of the Award, as providing for a fireman only on the one vetoed crew, and the fact that firemen were actually retained in the positions on these crews until January 3, 1967, would be no bar to their subsequent separation.

The question arises because there were no "deadman controls" on the equipment as of the date of the expiration of the Award, and paragraph B(5) of the Award, which provided that the carrier was not required to use firemen on listed crews (that were not counter-designated by the Union), contained a proviso— "provided that no yard locomotive shall be operated without a fireman (helper) unless and until it is equipped with a deadman control in good operating condition." The February 28, 1962, RE-PORT OF THE PRESIDENTIAL RAILROAD COMMISSION, which found that only in rare situations was the use of a fireman necessary for safe operation of locomotives in freight or yard service, had recommended that no yard locomotive should be operated without a fireman unless and until equipped with a deadman control in good operating condition.

The Opinion of the Neutral Members of Arbitration Board 282 refers to "installing a dead-man control in all yard engines which our award requires as a condition precedent to the operation of such locomotives without a fireman." Railroads v. Operating Brotherhoods, 41 Lab.Arb. 673, 687–699 (1963).

The carrier apparently ordered the deadman controls early in 1965, but because of delays in delivery and imperfections of equipment, the controls were not finally installed until December 1966, approximately nine months after expiration of the Award.

Although the District Court at first ruled favorably on the Union's application for an injunction to forestall the carrier from placing into effect its bulletin of January 3, 1967—in the light of its "affirmative acts" approach referred to in our *Akron* opinion—on reconsideration the District Court denied the relief sought, on the ground that the Union's position was contrary to a ruling of the Board 282 interpreting its Award. We find it unnecessary to refer to that ruling as such, or to the District Court's reasoning, because we think the principles set forth in our *Akron* opinion require affirmance of the judgment.

The Union also relies on our *Akron* opinion, and specifically on our ruling concerning the situation in states where full crew laws governed during the life of the Award. As to that we held that even though the elimination of the fireman positions listed by the carrier was blocked only because of the existence of that law, the subsequent repeal of the state law following expiration of the Award came too late for the carrier to terminate firemen involved, notwithstanding that during the lifetime of the Award the carrier had taken all the action available to it by listing the position for blanking.[2]

That ruling does not, however, apply to the issue before us. It was based on the principle that the existence of the state law meant that there was no pres-

---

2. *See Akron, supra* n. 1, 128 U.S.App.D.C. at 89, 385 F.2d at 611–612.

ent dispute then pending between the parties as to the size use of firemen, that the only dispute pending before Congress, and the only dispute as to which authority was delegated to the Board, was one that did not extend to crews in States which had full crew laws. *See* BLFE v. Chicago, Rock I. & Pac. R.R., 382 U.S. 423, 433, 86 S.Ct. 594, 15 L.Ed.2d 501 (1966).[3] In short the existence of the state law limited the jurisdiction and authority of the Board.

The issue before us is not one where the Board's authority was thus limited. The decision whether to permit termination of the firemen positions was part of the dispute before the Board; the only question was whether, and under what conditions. Although the Award uses the punctuation of a proviso its meaning was simply this, that the work rule permissible under the Award was one providing that firemen would not be used when deadman controls were in working condition. Suppose deadman controls were in effect during the Award's lifetime and later became inoperative, either during the life of the Award or later. It would not be argued that the work rule discontinuing the fireman position was in effect on certain days (when the deadman controls were working) but not on other days (when the controls were not working). We think the sounder construction is that the same work rule is in effect at all times, but the practical consequence of the work rule will vary in accordance with physical conditions, depending on the condition of the deadman control.

In our view the work rule in effect on the last day of the Award provided that the crews involved here were crews on which firemen were not required whenever the deadman controls were working; that work rule is still in effect; and it does not require a fireman on that crew even though the carrier had not removed the fireman by the end of the effective period of the Award.

3. *See* 382 U.S. at 433, 86 S.Ct. at 599: "Congress wanted to do as little as possible in solving the dispute which was

The Union develops what it presents as unwelcome consequences of this view. The District Court also appears to have been concerned with the harsh consequences of the carrier's approach. We do not explore this matter, nor consider whether the scope of our ruling leaves open to the Union some minor dispute that could be pressed in an administrative forum. We have rather concerned ourselves with what we consider to be the fundamental legal question raised by the appeal. We conclude that the judgment should be

Affirmed.

before it, and we note that this dispute was not over the size of crews in States which had full-crew laws."