The AKRON & BARBERTON BELT
RAILROAD COMPANY et al.,
Plaintiffs,

v.

BROTHERHOOD OF RAILROAD
TRAINMEN et al., Defendants.

Civ. A. No. 142–66.

United States District Court
District of Columbia.

March 3, 1966.

Francis M. Shea and Richard T. Conway, Washington, D. C., for plaintiffs.

Milton Kramer, Washington, D. C., for defendants Brotherhood of Railroad Trainmen and others.

James D. Hill, Washington, D. C., for defendant Order of Railway Conductors and Brakemen.

HOLTZOFF, District Judge.

This is an action brought by a group of railroads against several organizations of railway employees for an injunction against calling a strike and for a declaratory judgment. The suit was instituted in the light of the termination of the effective period of two years, of an award of a compulsory arbitration directed by Congress in respect to certain issues in controversy between the parties. A temporary restraining order was granted at the institution of this action and has been extended by consent to continue until after the trial.

Pursuant to a pretrial order made with the consent of the parties a hearing has been held on the following two basic issues in advance of the trial: (a) the effect of the expiration of the period during which the Award of Arbitration Board No. 282 continued in force, as provided in Section IV of that Award pursuant to Section 4 of Public Law 88–108; and (b) whether the Norris-LaGuardia Act is applicable to the plaintiffs' request for injunctive relief. This decision deals with these two questions.

At the outset it is desirable to analyze and summarize the somewhat complicated system prescribed by the Railway Labor Act (Act of May 20, 1926, 44 Stat. 577, as amended, 45 U.S.C. § 151 et seq.) for amicable adjustments of labor disputes in the railroad industry. The statute contains a well conceived, carefully planned, elaborate scheme for the settlement of differences between carriers and their employees by means of negotiation, mediation, and arbitration. It provides in detail certain specified steps to be pursued in chronological order when such a controversy arises. Neither employers nor employees may unilaterally make or insist on any changes in agreements affecting rates of pay, rules, or working conditions, without first exhausting the remedies provided by the Act.

The initial step to be taken either by a carrier or an organization representing employees, in the event that it desires an alteration in an existing arrangement, is to serve a 30-days' written notice of its intention to achieve the change. The time and place for the beginning of conferences between the representatives of the parties, are then to be agreed upon within ten days after the receipt of the notice. The date of the first conference must be within the 30-day period provided in the notice, Railway Labor Act, Sec. 5, 45 U.S.C. § 155.

The Act further provided for the creation of the National Mediation Board appointed by the President, Railway Labor Act, Sec. 4, 45 U.S.C. § 154. If the negotiations between the parties do not result in a settlement of the dispute, either party is authorized to invoke the assistance of the Mediation Board. In addition the Mediation Board is empowered to proffer its services on its own initiative, in case of an emergency.

If the negotiations and mediation still do not lead to an adjustment of the controversy, it may be submitted to a board of arbitration by agreement of the parties, Railway Labor Act, Secs. 7, 8, 45 U.S.C. §§ 157, 158. While such an arbitration is purely voluntary, the statute prescribes the manner of creation and organization of such a board and the procedure to be followed by it. The award is binding and enforcible.

If either party declines to submit to arbitration and the controversy remains unsettled, and if the National Mediation Board is of the opinion that the dispute would substantially threaten to interrupt interstate commerce, the Board is required to notify the President. The

Board is also to notify the parties that its mediation efforts have failed. No change may then be made by the parties for 30 days. An Emergency Board may then be appointed by the President to investigate the dispute. The Emergency Board must report to the President within 30 days from the date of its appointment. After the creation of such Board and for 30 days after the Board has made its report, no change except by agreement may be made by the parties in the conditions out of which the dispute arose.

At the expiration of the last mentioned 30-day period the remedies provided by the Railway Labor Act are exhausted. If the dispute still remains unresolved, presumably either party may act unilaterally and resort to self help. To state it more bluntly, the railroads may then proceed to make the desired changes in rates of pay, rules or working conditions, or discharge employees whom they deem unnecessary. On the other hand, representatives of the employees may call them out on strike. Industrial strife is in the offing. If the dispute is on a sufficiently large scale, the possibilities of serious detrimental and even disastrous effects to the public, are readily envisaged. Lack of any further safeguard after the last stage of the statutory arrangement is passed, is the Achilles' heel of the enlightened and beneficent plan provided by the Railway Labor Act. This possible contingency is manifestly inescapable. It was hoped and even expected that the controversy would be settled at one of the earlier stages before the impasse is reached. In most cases the hope and the expectation proved well-founded. Unfortunately in the nation-wide controversy involved in this litigation, they were not realized.[1]

■ The plan for the amicable adjustment of disputes consisting of a series of successive steps and stages that have been described, is not hortatory or precatory. It is legally binding and enforceable, except that an arbitration cannot be compelled. The leading decision on this subject is Virginian Railway Co. v. System Federation No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789, in which Mr. Justice Stone (later Chief Justice) wrote an historic opinion, speaking for a unanimous bench. This case breathed the spirit of life into the Railway Labor Act. It overruled the contention of a railroad company that there was no duty to negotiate pursuant to the notices referred to in the statute. The Court held that on the contrary there was an obligation enforceable by legal sanctions to act under the various provisions of the Act. Specifically the Court ruled that it was the duty of the parties to negotiate after notices were served, and that this duty was enforceable by judicial decree. It sustained an order compelling the carrier to do so. On this point Mr. Justice Stone wrote as follows (pp. 548, 552, 57 S.Ct. pp. 599, 601):

> The statute does not undertake to compel agreement between the employer and employees, but it does command those preliminary steps without which no agreement can be reached. It at least requires the employer to meet and confer with the authorized representative of its employees, to listen to their complaints, to make reasonable effort to compose differences—in short, to enter into a negotiation for the settlement of labor disputes such as is contemplated by section 2, First.

1. The Railway Labor Act also established a parallel system for the disposition of another category of controversies, known as "minor disputes", i. e., disputes growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, as distinguished from "major disputes", i. e., controversies concerning what agreements should be reached to govern such matters. For the purpose of determining minor disputes the statute created a National Railroad Adjustment Board, whose duty is to hear and decide such disputes, and whose decisions are legally binding. Any party to such a dispute may refer it to the Adjustment Board, Railway Labor Act, Sec. 3, 45 U.S.C. § 153. In effect, a system of compulsory arbitration was created and has been in operation since 1926.

\* \* \* \* \* \*

The peaceable settlement of labor controversies, especially where they may seriously impair the ability of an interstate rail carrier to perform its service to the public, is a matter of public concern.

\* \* \* \* \* \*

The fact that Congress has indicated its purpose to make negotiation obligatory is in itself a declaration of public interest and policy which should be persuasive in inducing courts to give relief.

These views were reiterated in Elgin, J. & E. R. Co. v. Burley, 325 U.S. 711, 719, 65 S.Ct. 1282, 89 L.Ed. 1886 in which Mr. Justice Rutledge wrote the opinion.

The present controversy had its inception on November 2, 1959, when most of the Class 1 railroads in the United States, many of whom are plaintiffs in the present action, served notices, pursuant to Section 6 of the Railway Labor Act, on organizations · of railroad employees, stating that it was their intention to eliminate numerous employees whose services had become unnecessary as a result of technological improvements. Specifically it was proposed to eliminate firemen on diesel engines in freight and yard service, and to reduce the number of members of the train crew on numerous runs. On September 7, 1960, employees' organizations served counter-notices, the purport of which indicated an intention to maintain the existing conditions. As soon as the first group of notices was served, the remedies prescribed by the Railway Labor Act were immediately brought into play: negotiations took place; the services of the Mediation Board were invoked; and eventually when arbitration was declined, an Emergency Board was created and made its report. During the intervening period, the President appointed a Special Commission which likewise made an investigation and presented a report.

With the creation of the Emergency Board and the submission of its report, all the remedies afforded by the Railway Labor Act were exhausted without avail. As the Supreme Court held in connection with this controversy, the parties were then relegated to self help in adjusting their disputes, Brotherhood of Locomotive Engineers v. B. & O. R. Co., 372 U.S. 284, 83 S.Ct. 691, 9 L.Ed.2d 759. In other words, the railroads were free to dispense with the services of numerous employees in accordance with the proposal contained in their notices of November 2, 1959. On the other hand, the railroad employees were free to strike.[2]

By this time it was August, 1963. The country was confronted with the specter of a nationwide railroad strike, which would paralyze industry. Disaster and havoc were feared. Congress acted expeditiously in order to stave off such a catastrophe. A Joint Resolution was promptly passed, which became law on August 28, 1963, Public Law No. 88–108, 77 Stat. 132. It commanded a compulsory arbitration of the two principal issues in dispute between the parties.

This enactment expressly prohibited any changes in rates of pay, rules, or working conditions covered by the groups of notices respectively served by the carriers and labor organizations, except by agreement or pursuant to an arbitration award. It explicitly prohibited any strike or lock-out (Sec. 1). It directed the creation of an Arbitration Board to pass on two issues: the use of firemen on other than steam-powered locomotives in freight and yard service; and the size and composition of train crews (Secs. 2 and 3). Thus, Congress in effect ordered a compulsory arbitration of these two basic issues. It provided that the arbitration should be conducted pursuant to the applicable sections of the Railway Labor Act, 45 U.S.C. §§ 157–159. The award of the Board was to be binding on the parties. It was to be filed in the

---

2. A brief history of the dispute is contained in the opinion of this Court in Brotherhood of Locomotive Firemen and Enginemen v. Chicago, B. & Q. Ry. Co., D.C., 225 F.Supp. 11, 14–15.

United States District Court for the District of Columbia. It was to be in effect for such period as the Arbitration Board should determine, but not to exceed two years from its effective date, unless the parties agreed otherwise. In all other respects, the statute was to expire 180 days from the date of its enactment.

The Arbitration Board, which eventually became known as Board No. 282, was constituted as required by the Joint Resolution, held hearings, and rendered its award on November 26, 1963. The effective date of the award was January 25, 1964. Pursuant to its terms, it remained in effect until January 25, 1966, except that it was extended for a couple of months by agreement in respect to several, though not all, of the organizations of employees.

The pertinent provisions of the award may be summarized as follows. First, the Board held that firemen were no longer necessary on diesel engines in freight or yard service, except as to ten percent of the firemen, who might be needed for exceptional situations. Nevertheless, all firemen regularly employed on the effective date of the award who had a seniority of ten years or more, were to retain their status and were to continue in their employment until death, resignation, retirement, or discharge for cause. In other words, firemen in this group were accorded practically a permanent tenure for the period of their working lives. Firemen who had seniority of between two to ten years were to receive the same rights, with the qualification, however, that they might be offered other comparable positions for which they were or could become qualified. In that event they were guaranteed five years' service in their new employment. Firemen who had been hired within two years prior to the effective date of the award were not to be entitled to retain their employment or seniority rights, but if their services were terminated, they were to receive a lump sum termination allowance.

The second issue determined by the Board was to fix the size of train crews, referred to in the parlance of the industry as "crew consist". No change was to be made in any stipulated number of members of train crews except by agreement or pursuant to the provisions of the award. Any party was permitted to give notice of a proposed change and if no agreement was reached, the issue could be referred by either party for decision to a Special Board of Adjustment, to be created in the manner prescribed by the award. A series of specific and concrete principles were formulated and prescribed by the award to be followed by these special tribunals.

There has been considerable activity pursuant to the award. Numerous firemen with less than two years' tenure have been separated from the service and received separation allowances. Many firemen who had been employed for periods from two to ten years have been offered other comparable jobs. Some of these men have accepted these offers. Others have declined to do so. In that event the termination of their employment was accompanied by a separation allowance. Some of the firemen who had more than ten years experience, in the natural order of events, retired, resigned, or died. It is not disputed that there has been a considerable reduction in the number of firemen working in freight and yard service on diesel engines. Undoubtedly, many still remain, even though the Board held that all but ten percent of the firemen were surplusage. So, too, numerous steps were taken pursuant to the award which resulted in the reduction of the size of train crews on many train runs throughout the country.

The question now arises what is the effect of the termination of the effectiveness of the award, and what may the parties do as a result of the fact that the effective period of the award has come to an end. Both the award and the special Act of Congress are silent on this point. There are several possible constructions of the Act in this regard. It

is urged in behalf of the labor organizations that the moment the effectiveness of the award comes to an end, it must be deemed a nullity and the *status quo* that existed before the passage of the Joint Resolution of August 28, 1963, is restored. That *status quo* is, as urged by counsel for the labor organizations, that the rules, rates of pay, and working conditions that existed prior to the service of the notices of 1959 and 1960, respectively, came back in effect, and that parties may resort to self help to compel their enforcement. In other words, it is contended that labor organizations may call a strike unless the railroads re-hire the same number of firemen that they had in service previously to August 28, 1963, and restore the size of every train crew all over the country to the size prevailing prior to that date. Were such a construction to be adopted, everything that has been accomplished by the award would be wiped out except that the fatal day will have been postponed for two years.

As heretofore stated, many employees have been discharged and many jobs have been abolished. It would seem unreasonable to construe the Act of Congress and the award made pursuant to it, as requiring restoration of these positions and a re-hiring of thousands of employees. More than that, if the award becomes a nullity, the permanent tenure that was granted by the award to large groups of employees would be wiped out. The vested rights of an unknown number of employees, probably large, would be immediately destroyed. This is particularly true of the firemen who had more than ten years' service. Their lifetime security would be abrogated. A question would arise whether the firemen who had accepted comparable jobs with a guaranty of five years' employment, would have a right to insist on the guaranty. Any employee who was re-hired would have to pay back the severance allowance that he had received. Such would be the logical result if the

defendants' contention were adopted. As a matter of fact, it would probably be impossible to find immediately a sufficient number of qualified employees to fill the requirements that would be artificially created. Surely Arbitration Board No. 282, composed of eminent and experienced men, could not have contemplated that its work would go for naught, and that the permanent rights accorded by it to thousands of employees would be destroyed at the end of the two-year period. The conclusion is inescapable that the construction urged by the labor organizations is unreasonable and would defeat the very purpose of the legislation and of the award. The Court rejects it.

The doctrine that all statutes should receive a sensible and reasonable construction [3] is equally applicable to the award involved in this case. This Court is of the opinion and concludes that the results of the termination of the effective period of the award of Board 282, are as follows.

No further steps may be taken under the award by either side after its termination date. Thus the railroads may not discharge any more firemen pursuant to the provisions of the award, and they may not initiate proceedings under the award for changing the size and composition of train crews on specified runs. They may not take any other steps under the award. So, too, no new privileges may accrue to employees under the terms of the award. On the other hand, what has been accomplished under the award remains and is not to be nullified or wiped out. Any rights that became vested under the award while it was in effect, remain vested. Thus, the firemen with seniority of more than ten years, who were granted a permanent status for their working lives, retain that status. It is not annulled. The firemen who accepted comparable jobs with a guaranty of five years' employment, preserve the guaranty. Members of train crews who were accorded permanent status under

---

3. United States v. Kirby, 7 Wall. 482, 74 U.S. 482, 19 L.Ed. 278; United States v. American Trucking Ass'ns., 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345.

the award do not relinquish it. The employees who have received severance pay may retain the money. They are under no obligation to refund it, as they might have been were the award to be regarded as a nullity. If the award were a nullity, a serious question would arise whether an action in quasi-contract for money had and received under a mutual mistake, might not lie in behalf of the carriers against all former employees who received severance pay.

On the other hand, the carriers have a right to maintain the status that existed on the date of the termination of the award. The vacancies caused by the separation of firemen and members of train crews pursuant to the award, may remain unfilled. To require the railroads to go out and immediately find qualified employees to fill the places that have been abolished would be not only unreasonable, but would lead to an absurdity.

■ The Court is further of the opinion that the steps taken under the award have resulted in the creation of a new status. The fact that the arbitration was compulsory rather than voluntary does not affect the problem. The award of the compulsory arbitration for this purpose must be regarded as taking the place of an agreement within the meaning of the Railway Labor Act. The Act should receive a liberal construction. The parties have arrived at a new plateau as a result of the proceedings under the award.

■ The conclusion is inescapable that since a new status has been created under the Act neither side may take any unilateral action or resort to self help. The carrier may not change rates of pay, rules, or working conditions, including size of train crews, employment of firemen, etc., and, on the other hand, the employees may not call a strike or use other coercive measures in order to enforce their demands. If either side desires to bring about any change in the arrangements resulting from the award, it must initiate proceedings by serving notices under Section 6 of the Railway Labor Act and exhaust each step in the procedure prescribed by that statute. The status existing prior to the award is not restored.

■ Manifestly the Arbitration Board construed the Act as authorizing it to provide for the creation of rights during the effective period of the award that would endure thereafter. It is an elementary principle of statutory construction that the interpretation of a statute by the administrative agency that administers it, is to be accorded great weight and should ordinarily be accepted unless obviously erroneous or unreasonable.

In view of these considerations, any threatened strike may be enjoined and reciprocally the carriers may be required by judicial decree to submit to the invocation of remedies provided by the Act.

■ A question was raised by counsel as to the status of the notices that some of the employees' organizations have served during the effective period of the award. The Court is of the opinion and concludes that such notices may not be deemed effective as of a date prior to the termination of the award. It would be a futile gesture, however, to require the parties to serve new notices. A reasonable interpretation of the situation is that the notices that have been served may remain, but that they become effective only on the day after the termination of the award. The various proceedings under the Railway Labor Act need not be initiated until after that time.

■ The second question to be determined as a result of this hearing, is whether the Norris-LaGuardia Act, 29 U.S.C. § 107 bars the granting of an injunction against a strike, and whether any provision of that Act is applicable to an application for such an injunction. At the outset it may be stated that an injunction against a strike may be properly granted to maintain the *status quo*, while the parties pursue the various steps of negotiation, mediation, or arbitration provided by the Railway Labor Act. Such an injunction is one of the means which the courts may invoke to

enforce the provisions of the Railway Labor Act. Equity decrees of other types may likewise be employed for similar purposes.

Thus it was said by Circuit Judge Friendly for the Second Circuit, in Manning v. American Airlines, Inc., 329 F.2d 32, 34:

> The propriety of an injunction to enforce the then unique provisions of the Railway Labor Act for maintaining the *status quo* while the parties to a labor dispute pursue various stages of negotiation, mediation or arbitration, was established long ago.

In Virginian Railway Co. v. System Federation No. 40, 300 U.S. 515, 562–563, 57 S.Ct. 592, 607, 81 L.Ed. 789, which has already been discussed in some detail, it was held in an opinion by Mr. Justice Stone that the Railway Labor Act supersedes the Norris-LaGuardia Act in the sense that the provisions of the Railway Labor Act "cannot be rendered nugatory by the earlier and more general provisions of the Norris-LaGuardia Act".

In Brotherhood of Railroad Trainmen et al. v. Chicago R. & I. R. Co., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622, in which Mr. Chief Justice Warren delivered the opinion for a unanimous Court, it was expressly held that the use of injunctive relief to vindicate the processes of the Railway Labor Act, is authorized, and that the specific provisions of the Railway Labor Act take precedence over the more general provisions of the Norris-LaGuardia Act (pp. 41–42, 77 S.Ct. 635). A similar conclusion was reached in Brotherhood of Locomotive Engineers et al. v. Louisville & N. R. Co., 373 U.S. 33, 39, 83 S.Ct. 1059, 10 L.Ed.2d 172.

The defendants rely on two cases, which however are clearly distinguishable. In Brotherhood of Railroad Trainmen v. Toledo, P. & W. R. Co., 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534, it was held that a railroad was not entitled to an injunction against a strike if it declined to subject itself to one of the remedies accorded by the Railway Labor Act, in that case the machinery for voluntary arbitration. In Order of Railroad Telegraphers v. Chicago & N. W. R. Co., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774, it was held that there was no basis for enjoining a strike at the behest of a railroad that had declined to negotiate, because of an erroneous view as to whether it was under a duty to negotiate concerning the subject matter involved in the dispute.

This Court finds no basis for holding that some of the provisions of the Norris-LaGuardia Act may be applicable while others may not be. This Court reaches the conclusion that no provision of the Norris-LaGuardia Act applies to an action or an application for an injunction against a strike of railroad employees if the defendants have failed to fulfill their obligations under the Railway Labor Act.

The conclusions reached by this Court in this opinion will be embodied in the final judgment to be entered after the trial of this action.