**BANGOR AND AROOSTOCK RAIL-
ROAD COMPANY et al., Plaintiffs,**

v.

**BROTHERHOOD OF LOCOMOTIVE
FIREMEN AND ENGINEMEN,**
Defendant.

**BROTHERHOOD OF LOCOMOTIVE
FIREMEN AND ENGINEMEN,**
Plaintiff,

v.

**The ATCHISON, TOPEKA AND SANTA
FE RAILROAD COMPANY et al.,**
Defendants.

Civ. A. Nos. 777–66, 784–66.

United States District Court
District of Columbia.

May 5, 1966.

Francis M. Shea and Richard T. Conway, Washington, D. C., for plaintiffs in

Action No. 777–66, and for defendants in Action No. 784–66.

Joseph L. Rauh, Jr., and Isaac N. Groner, Washington, D. C., for defendant in Action No. 777–66, and for plaintiff in Action No. 784–66.

HOLTZOFF, District Judge.

This is the trial of two consolidated actions, one brought by a group of railroads against the Brotherhood of Locomotive Firemen and Enginemen, and the other instituted by the Brotherhood against a number of railroads. The second action had been filed originally in the United States District Court for the Northern District of Illinois, and on defendants' motion was transferred here by Chief Judge Campbell of the Illinois Federal Court. The two were then consolidated on motion of the plaintiffs in Action No. 777–66. In each action a declaratory judgment and a permanent injunction are sought and a counterclaim is interposed for reciprocal relief.

The basic issues to be determined are the effect and the consequences of the termination of the effective period of an Award of a compulsory arbitration proceeding concerning two principal issues of a nationwide controversy between Class I railroads and organizations of railway employees. The differences in dispute were the need for continued use of firemen on Diesel engines in freight and yard service, and the possibility of reduction in the size of train crews on numerous runs throughout the country. The compulsory arbitration was directed by a Joint Resolution of Congress, approved August 28, 1963, 77 Stat. 132, in order to prevent a threatened nationwide railroad strike.

It was claimed by the carriers that firemen were not needed on Diesel engines in freight and yard service, as there were no longer any fires to stoke and that whatever other help was rendered by the fireman was in fact accorded by the head brakeman, whose post was also in the cab of the engine.[1]

1. No question was raised as to the necessity of firemen in passenger service because the railroads did not dispute the need of having two men in the cab, and

The Arbitration Board, known as Board 282, reached the conclusion that firemen were no longer needed on Diesel engines in freight and yard service, except as to ten percent of the number, who it was held should be retained for unusual and extraordinary situations. In order to prevent hardship and distress to thousands of employees, however, the Award of the Board did not direct that ninety percent of the firemen in question could be discharged forthwith, but provided that the result should be accomplished only by attrition over the years, which would ease any possible financial distress to the individuals concerned and to their families. Accordingly, it was prescribed by the Award that all firemen who had at least ten years of service, should retain their status until death, retirement, resignation, or discharge for cause. The same right was extended to firemen having between two and ten years of service, with the qualification, however, that the carriers were to have the privilege of offering comparable positions to firemen in this class, for which they were qualified or could be made qualified, with a guarantee of employment in the new positions for at least five years. Any moving expenses incurred by the employees under these circumstances were to be borne by the employer. If such an offer were declined by the employee, he could be discharged upon the payment of severance pay, the size of which was dependent upon the length of his service. The employment of firemen of less than two years' service could be terminated upon the payment of severance allowances, again measured by the length of service.

In respect to the proposed reduction of sizes of crews on numerous trains, the Award formulated certain specific considerations called "guidelines", to govern the decision as to whether the size of any specific crew should be reduced. The is-sues as to particular crews were remanded to the local properties for negotiations. If negotiations did not result in an agreement, special boards of adjustment were to be created in the respective localities in order to resolve the disputes.[2]

The consolidated actions now before the Court were tried on the basis of a stipulation of facts, which the Court adopts as its findings of fact. This opinion will constitute the conclusions of law. The issues in these actions involve the provisions of the Award which relate to firemen. Similar questions affecting trainmen were determined in Akron & Barberton Belt Railroad Co. et al. v. Brotherhood of Railroad Trainmen et al., D.C., 250 F.Supp. 691.

The Joint Resolution of August 28, 1963 provided that the Award of the Arbitration Board was not to become effective until sixty days after it was filed. The statute further directed that the Award was to continue in force for such period as the Board should determine, but not to exceed two years from its effective date. The Board ordered in the Award that it should continue for two years from its effective date, unless the parties agreed otherwise. The expiration date of the Award was originally January 25, 1966. It was extended by agreement to March 31, 1966 as to the Brotherhood of Locomotive Firemen and Enginemen.

While the Award was in effect the railroads gradually reduced the number of firemen in their employ by about 18,000, and paid separation allowances approximating about $36,000,000 to firemen whose employment was severed. About 1200 employees accepted offers of other positions under the provisions of the Award.

As heretofore indicated the questions to be determined at this time are the rights and liabilities of the par-

in passenger service it was not customary for a brakeman to be stationed in the cab.

**2.** The history of the controversy and the details of the arbitration and the Award were summarized in Brotherhood of Loco-motive Firemen and Enginemen v. Chicago, Burlington & Quincy Ry. Co., D.C., 225 F.Supp. 11; and in Akron & Barberton Belt Railroad Co. et al. v. Brotherhood of Railroad Trainmen et al., D.C., 250 F.Supp. 691.

ties in respect to firemen as to rates of pay, rules and working conditions after the expiration of the effective period of the Award. It is claimed by the union, as was also contended by the Brotherhood of Railroad Trainmen in the *Akron & Barberton* case, supra, that upon the termination of the effective period of the Award, the *status quo* that existed prior to the Award was automatically restored. The Court rejected this contention in the *Akron & Barberton* case, and here repeats that rejection.[3] The Award and the operations under it created a new status in regard to rules and working conditions. This status may not be changed, as was explained in detail in the opinion of this Court in the *Akron* case, except by agreement or by serving notices under Section 6 of the Railway Labor Act (45 U.S.C. § 151 et seq.) and exhausting, step by step, each of the remedies accorded by that statute.[4] Neither side may make changes unilaterally until the remedies under the Railway Labor Act are exhausted. No recourse may be had to self-help until that stage is reached, which means that so far as the firemen are concerned, they may not resort to a strike, and any such strike would be illegal.

Every statute must receive a reasonable and sensible construction. Any interpretation that obviously fails to effectuate the purpose and intent of the legislative body should be rejected. This doctrine applies not only to the Joint Resolution of Congress, but also to the Award of arbitration board. The Award manifestly contemplated the eventual permanent abolition of the jobs of firemen on Diesel engines in freight and yard service, except as to ten percent of that number, but proposed that the desired result should be reached gradually by a process of attrition. It was not intended, therefore, that the steps taken during the effective period of the Award should become a nullity at the end of the two-year period. The purpose of the Congress and the effect of the Award would be entirely frustrated if the railroads were required to rehire firemen whose positions have been abolished during that interval. So, too, the vested rights of those firemen who were accorded permanent protection by the Award, are not to be wiped out.

It is argued by counsel for the Brotherhood that since the Award is at an end, whenever any firemen dies, retires, or resigns thereafter his position should be filled by a new appointment. Such a course too would completely defeat the purpose and the meaning of the Award, for the objective of the Award was to abrogate the use of unnecessary firemen, but to accomplish this result by degrees and as far as possible in a painless manner.

On the other hand, neither side may take any further affirmative steps under the Award after its termination date. Thus, the railroads may not discharge any more firemen pursuant to the provisions of the Award. What has been accomplished under the Award remains and is not to be nullified or wiped out. The firemen with seniority of more than ten years retain a permanent status for their working life, which was granted to them by the Award. The firemen who accepted comparable jobs with a guarantee of five years' employment, retain that guaranty. On the other hand, the carriers are under no obligation to fill vacancies that had been caused by the separation of firemen from their positions, or to fill future vacancies. Those positions are permanently abolished. As heretofore stated, a new status has been created and no change may be made in that status except by agreement or by the service of notices under Section 6 of the Railway Labor Act, and recourse to the provisions of that statute.

A number of States have what are known as "full crew" laws, that

---

3. The reasons for this conclusion are summarized in detail in the *Akron* case, 250 F.Supp. 691, and need not be repeated here.

4. The machinery provided by the Railway Labor Act for the settlement of labor disputes is also described in detail in the opinion in the *Akron* case, supra.

require railroads operating within their borders to maintain crews of a certain specified minimum number. The Supreme Court has recently held in Brotherhood of Locomotive Engineers v. Chicago, R. I. & P. R. Co., 382 U.S. 423, 86 S.Ct. 594, 15 L.Ed.2d 501, that Award 282 did not supersede these "full crew" laws. The result is that in some States, the railroads have not been able to achieve reductions in the number of firemen that they would have been permitted to make under the Award, if the "full crew" laws had not interfered. One of those States is Oregon, which has recently repealed its full crew law effective January 1, 1967. It is argued by counsel for the carriers that after January 1, 1967, the railroads should be permitted to take advantage of the provisions of the Award to the extent of offering comparable jobs to firemen who had between two and ten years' standing, and discharging firemen of less than two years' standing. This Court disagrees. Since the effective period of the Award has expired, no affirmative steps may be taken under it. The mere fact that State statutes, as construed by the Supreme Court, have prevented the railroads in some instances from taking full advantage of the provisions of the Award, does not have the effect of prolonging or restoring their rights when the bar of the State statute is eliminated. The situation must be deemed frozen as of the close of the effective period of the Award. This is entirely different from the converse ruling that no vacancies occurring by attrition after the termination date need be filled. In other words, there is no right or duty to take any affirmative step under the Award on the part of either side after the crucial date.

◼ As has been indicated and as this Court held in the *Akron* case, a new status was created by the Award and the activities under it. This status prevailed as of the date of the termination of the effective period of the Award. The sole and exclusive method of modifying it is either by agreement or by serving appropriate notices under Section 6 of the Railway Labor Act and going through the various steps by way of negotiations, mediation, and the other proceedings provided by the statute. In this instance, three such notices were served by the union during the effective period of the Award. As this Court held in the *Akron* case, while notices might be served during that interval, they did not become effective until the day after the termination of the effective period of the Award. In other words, neither side was under any obligation to participate in any of the proceedings accorded by the Railway Labor Act, pursuant to such notices until after March 31, 1966.

◼ Naturally, there are certain limitations on the types of notices that may be served under Section 6 of the Act. They must relate to issues concerning which the party that initiates them has a right to insist on negotiating. In other words, to use the terminology of the Labor law, they must involve "bargainable issues", Elgin, J. & E. R. Co. v. Burley, 325 U.S. 711, 739–740, 65 S.Ct. 1282, 89 L.Ed. 1886. Second, so far as Award 282 is concerned, the employees may not in the guise of serving notices under Section 6 of the Railway Labor Act, seek to abrogate or set aside the Award. It must be borne in mind that the Award is the result of a compulsory arbitration conducted under a mandate of Congress and has the stamp of judicial approval in the form of a judgment in a proceeding to impeach it. Neither a carrier, nor a union may institute proceedings, directly or indirectly, to set aside any provision of the Award, or the operations or activities that have taken place under it or the results that have been achieved. Collective bargaining must be restricted to the future and may not relate to alleged past grievances, Elgin, J. & E. R. Co. v. Burley, supra.

◼ This discussion brings us to a consideration of the three notices served by the Brotherhood, which are involved in these actions. By stipulation the effect and validity of Notice No. 3 were withdrawn from disposition at this trial and were reserved for later consideration. The Court will, therefore, limit its deci-

sion in this respect to the first two notices. Notice No. 1, dated November 15, 1965, proposes that firemen taken from the seniority ranks of firemen shall be used on all locomotives on road and yard service, with a few enumerated exceptions. It provides further that a "job" may be operated without a fireman only when it becomes necessary to hire a fireman. Further it proposes that the carriers should hire and place on the firemen's seniority roster a sufficient number of firemen to comply with the provisions of the notice. In other words, this notice demands the restoration of firemen on those runs for which Award 282 expressly held firemen were unnecessary. Obviously, compliance with this notice would be a consent to abrogate and do away with the outcome of the arbitration.

Notice No. 2, served at the same time, goes even further. It proposes that all employees whose employment and seniority were terminated under the Award of Arbitration Board 282 should be recalled and restored to their seniority roster and employed with their original seniority date and used as firemen. It further proposes that individuals so restored should be reimbursed for any monetary losses sustained by them as a result of the termination of their employment and for expenses that they may have incurred by way of travel, lodging and meals, etc., or as a result of sale of homes. This Notice uses the terms "application or misapplication" of the Award, and denominates the termination of employment under the Award as being "improper". Manifestly, the use of such phraseology is not to be commended. The Board that rendered the Award was created under the law of the land and its Award has eventuated in a judgment of the Court. Irrespective of the inappropriateness of the phraseology, the purpose of the Notice is not only to set aside the Award and to restore firemen whose employment has been lawfully terminated, but in addition to provide for the payment of damages or losses alleged to have been sustained by them. Manifest-

ly, this is not permissible. The validity of the Award and of any steps taken under it during its effective period, are obviously not "bargainable issues".

It follows hence that Notices 1 and 2 are not valid under Section 6 of the Railway Labor Act and that, consequently, there is no obligation on the part of the carriers to enter into negotiations concerning the subject matter of these Notices. The union may not resort to unilateral action or have recourse to self-help in order to bring about the results sought by the Notices. In other words, any strike for that purpose would be illegal as in violation of the Railway Labor Act and subject to injunction.

At the trial counsel for the union moved to dismiss the complaint as to three of the carriers and also as to the railroads constituting the Southern Railway System, on the ground that Award 282 was inapplicable to them. For reasons stated at the trial and also discussed in the opinion of this Court in the *Akron* case, supra, the motion was denied.

The union also reiterated its position that the Norris-LaGuardia Act was applicable to any attempt to enjoin any strike of railroad employees. For reasons fully stated by this Court in its opinion in the *Akron* case, which it would be surplusage to repeat, the Court holds that the Norris-LaGuardia Act is not applicable to an action or motion for such an injunction or a temporary restraining order.

In conclusion this Court may summarize its rulings as follows:

1. The termination of the two-year effective period of the Award of Arbitration Board 282 did not restore the rates of pay, rules, and working conditions existing prior to the enactment of the Joint Resolution of Congress of August 28, 1963. On the contrary, the provisions of the Award and actions taken under it during its effective period created a new set of rules and working conditions as of the date of its termination. Any attempt to change the new status may be pursued only by serving appropriate no-

tices under Section 6 of the Railway Labor Act and invoking the course of action in the various stages prescribed by that statute.

2. Rights that have become vested as a result of the operation of the Award remain vested, and are not nullified. Thus, firemen having more than ten years' seniority retain the permanent status accorded to them by the Award until death, retirement or resignation. Firemen having a seniority of two to ten years, who have accepted comparable jobs with a five year guarantee of employment retain that guaranty. Firemen whose employment has been severed and who have received severance allowances, retain the money that has been paid to them. The positions that have been abolished as a result of the operations of the Award are permanently abolished.

4. Whenever any fireman who has a vested seniority under the Award dies, retires, or resigns, the position that he had filled is automatically abolished and consequently no one need be designated to fill it.

5. As no further steps may be taken under the Award after the termination of its effective period, the carriers may not dispense with any more firemen pursuant to the terms of the Award, or offer comparable jobs to any of them. The fact that in some instances the carriers have been prevented by State "full crew" laws from severing the employment of some firemen in accordance with the Award, does not authorize the carriers to dispense with them or offer them comparable jobs after the repeal of any "full crew" law.

6. Notices that were served under Section 6 of the Railway Labor Act, during the effective period of the Award, although premature, are nevertheless to be regarded as having been legally served and need not be served again. They did not become effective, however, until the day after the termination of the effective period of the Award and there was no obligation on the part of either side to proceed to conferences, negotiations, or mediations required by the Act until after that date.

7. Notices 1 and 2 served by the Brotherhood of Locomotive Firemen and Enginemen purportedly under Section 6 of the Railway Labor Act are invalid in that they do not relate to matters subject to collective bargaining under the statute, but are attempts to abrogate the provisions of the Award of Arbitration Board 282, and in effect to restore the situation as it existed on August 28, 1963 with a reimbursement for losses alleged to have been sustained by firemen who have been discharged. These notices being illegal and ineffective, need not be complied with.

8. The Norris-LaGuardia Act does not apply to any action or motion for a preliminary or permanent injunction, or restraining order against a strike in violation of the provisions of the Railway Labor Act.

9. Any strike of railroad employees called before the exhaustion of all remedies provided by the Railway Labor Act would be illegal.

10. The prayer for a permanent injunction against a strike is hereby granted.

 Counsel may submit an appropriate judgment in accordance with the foregoing rulings.[5]

---

5. Counsel for the Brotherhood of Locomotive Firemen and Enginemen, shortly prior to the trial of this action, filed a motion that the Judge disqualify himself, and this motion was accompanied by a so-called "affidavit of bias and prejudice". The Court denied the motion and overruled the affidavit. This action was based on two grounds: first, the affidavit was not timely filed in that it was submitted after a number of motions were heard and disposed of in this action; second, the affidavit contained no showing that the Judge had any personal bias or prejudice against the Brotherhood, but merely that the Judge had made certain rulings that were adverse to the Brotherhood. The fact that adverse rulings are made by a Judge is not a ground for an affidavit of bias and prejudice. It may be noted in passing that the affidavit ascribes to the Judge a statement that the

Court would not *sua sponte* take steps to enforce the collection of the fine theretofore imposed, but this could be done only on the motion of the carriers or of the Government. This statement was in fact made by the Judge from the bench in open court in view of the fact that the fine was imposed for civil and not criminal contempt. It was made during a hearing on some of the many motions in this litigation. Obviously, this statement does not establish personal bias or prejudice, but

quite the contrary. The authorities on these points were thoroughly reviewed by Judge Sirica of this Court in United States v. Hanrahan, D.C., 248 F.Supp. 471, and by Judge Wilson of the Eastern District of Tennessee, in United States v. Hoffa, D.C., 245 F.Supp. 772. This Court refers to and agrees with the discussion of the law on this subject in those two cases, and it would be surplusage to repeat it here.