BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN, Plaintiff-Appellant,

v.

ELGIN, JOLIET & EASTERN RAILWAY COMPANY, Defendant-Appellee.

No. 16876.

United States Court of Appeals Seventh Circuit.

Dec. 4, 1968.

Alex Elson, Willard Lassers, Aaron S. Wolff, Chicago, Ill., Thomas H. Clifford, Jr., Gary, Ind., Harold C. Heiss, Cleveland, Ohio, Elson, Lassers & Wolff, Chicago, Ill., Heiss, Day & Bennett, Cleveland, Ohio, Thomas H. Clifford, Jr., Lucas, Clifford & Wildermuth Gary, Ind., for appellant.

W. Gerald Thursby, Chicago, Ill., Hackbert, Rooks, Pitts, Fullagar & Poust, Chicago, Ill., of counsel, for appellee.

Before CASTLE, Chief Judge, and HASTINGS and KERNER, Circuit Judges.

CASTLE, Chief Judge.

This case arose under the Railway Labor Act, 45 U.S.C. § 151 et seq., and concerns the obligation of the defendant railroad to employ firemen, members of the plaintiff brotherhood (BLF&E), on a switching locomotive which is operated for the railroad's parent company, United States Steel Company, within the latter's Gary, Indiana plant. The railroad claims that, pursuant to the collective bargaining agreement, as modified by Arbitration Award No. 282, issued pursuant to Public Law 88–108, 77 Stat. 132, it need not employ a fireman on the switching locomotive. The BLF&E, on the other hand, argues that the award did not modify the National Diesel Agreement or the collective bargaining agreement in "full crew" states such as Indiana.

The BLF&E relies heavily on the recent case of Bangor & A. R. Co. v. Brotherhood of Locomotive Firemen and Enginemen, 253 F.Supp. 682 (D.D.C. 1966), affirmed in part and reversed in part, sub nom, Brotherhood of Railroad Trainmen v. Akron & B. B. R. Co., 385 F. 2d 581 (D.C.Cir., 1967), cert. denied 390 U.S. 923, 88 S.Ct. 851, 19 L.Ed.2d 983 (1968), to which both plaintiff and defendant in the instant case were parties. The court there dealt with the similar problem of whether Arbitration Award 282, which by its terms was to last two years, and had by then expired, permitted the railroads to continue using the procedures established by the award to abolish firemen's jobs. The district court in the instant case properly summarized the holding in *Bangor*:

"There the Court of Appeals held, in essence, that the Arbitration Award was not part of the work rules or collective bargaining agreements between the parties, but rather, it had established a method, which terminated with the award, for changing these agreements. It held that those jobs abolished during the period of the award did not have to be reestablished but that the procedures of the award were no longer available to the railroads. It further held that 'any new runs created after Award 282 are subject to the National Diesel Agreement, and its requirement of a fireman on each engine crew. Moreover, the National Diesel Agreement is in effect even though the only reason why a change in its work rule was not made under the Award during its lifetime was the fact that the change was blocked by a state's full crew law.' The Supreme Court denied certiorari on January 29, 1968."

The district court dismissed the suit on the ground that it had no jurisdiction since the dispute before it was "minor" rather than "major" and therefore exclusively within the jurisdiction of the agency created by the Act. Since we agree with the district court that the dispute in the instant case is "minor," and therefore the federal courts are without jurisdiction, we find it unnecessary and inappropriate to consider the merits of the controversy, namely, whether or not the agreement, as it now stands, permits the railroad to operate the switch locomotive without a fireman. Rather, we shall deal only with the determination that the instant dispute, within the meaning of the Act and the cases interpreting the Act, is "minor."

In this regard, a short look at the history of our national railway labor policy is necessary. In 1926, Congress first set up the machinery and the procedures which are embodied in the Railway Labor Act, in order to lessen the threat to interstate commerce posed by strikes in the railroad industry. The Act and the case law dealing with it recognize the basic difference between two classes of labor disputes: the so-called "major" and "minor" disputes.

"The first relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no agreement or where it is sought to change the terms of one, and therefore the issue is not whether

an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

"The second class, however, contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. * * * "In general, the difference is between what are regarded traditionally as the major and minor disputes of the railway labor world." Elgin, Joliet & Eastern R. Co. v. Burley, 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L. Ed. 1886 (1945).

The consequences of determining whether a dispute falls within one class or the other are quite significant and, in fact, determinative of the case before us. If a dispute is "major," it must be resolved under the procedures prescribed by § 6 of the Act, 45 U.S.C. § 156, under which notice must be given, followed by negotiation, mediation by the National Mediation Board, voluntary arbitration, possible conciliation attempts by the President (by a Presidential Emergency Board), and finally, if no agreement can be reached, by self-help by the parties. "Minor" disputes, on the other hand, must first go to negotiation, and if that fails, then to binding arbitration by the National Railroad Adjustment Board (NRAB) or, alternatively, by a special Board of Adjustment.

The reason for the difference in treatment between the two types of disputes was the judgment of Congress that "minor" disputes were not of sufficient importance to justify a railroad strike with its consequent interruption of interstate commerce. Thus, a strike over a "minor" dispute can be enjoined to protect the jurisdiction of the NRAB, Brotherhood

of Railroad Trainmen v. Chicago R. & R. I. R. Co., 353 U.S. 30, 77 S.Ct. 635, 1 L. Ed.2d 622 (1957), while a strike over a "major" dispute can not be enjoined. Order of Railroad Telegraphers v. Chicago N. W. R. Co., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960). Moreover, the statutory procedures are exclusive and "[t]he right of one party to place the [minor] dispute before the Adjustment Board, with or without the consent of the other, has been firmly established. * * * And the other party may not defeat this right by resorting to some other forum." Brotherhood of Locomotive Engineers v. Louisville & N. R. Co., 373 U.S. 33, 38, 83 S.Ct. 1059, 1062, 10 L.Ed.2d 172 (1963).

We come, then, to the instant case and the facts leading up to it. Congress passed Public Law 88–108 in order to prevent a threatened nation-wide railroad strike occasioned by the railroads' notice that they planned to eliminate firemen's jobs on freight and switching engines. Under the Law, Arbitration Board 282 was established and Arbitration Award 282 was issued, to be effective from January 25, 1964, through January 24, 1966. The effect of the award after its expiration was the subject of the *Bangor* litigation, previously discussed. The BLF&E, in the instant case, contends that *Bangor* is res judicata to the instant case.

However, both parties agree that if the dispute is "minor," the federal courts are without jurisdiction to grant any relief, whereas if the dispute is "major," any changes in the rules and working conditions embodied in the agreements between the parties must be enjoined until all statutory procedures are completed. Virginian R. Co. v. System Federation No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L. Ed. 789 (1937).

We find that the reasoning of the cases discussed and the policy of the Railway Labor Act compel the conclusion that the instant dispute is "minor" and not "major." First, the present controversy can

be solved by an administrative interpretation of the existing agreement in light of Award 282. Although the holding of the District of Columbia Circuit Court of Appeals in the *Bangor* case may control part of the instant dispute, the agreement must still be applied to the facts presented.[1] Second, neither the BLF&E nor the railroad is seeking a new agreement; rather, they are each asserting rights under the present agreement as each party interprets it. Third, the nature of this controversy is such that the policy behind our entire system of railway labor law precludes the possibility of the use of a strike—with its consequent interference with interstate commerce—to settle the dispute. Rather than seeking a change in the present rights of the parties, the railroad here is demanding, in good faith, only what it believes its rights are under the terms which have been previously bargained for or arbitrated.

In short, this is not a situation where "there is no such agreement or where it is sought to change the terms of one"; rather, this case involves the issue of "whether an existing agreement controls the controversy." Elgin, Joliet & Eastern Ry. Co. v. Burley, 325 U.S. 711, 723, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945). As such, the dispute is "minor" and the federal courts are without jurisdiction to hear the case. The order dismissing the case for lack of jurisdiction is therefore affirmed.

Affirmed.

KERNER, Circuit Judge (dissenting).

I regret that for the first time I must respectfully dissent from a decision by my brethren.

The national labor policy for railroads is one which seeks to encourage industrial peace by substituting arbitration for strikes in minor disputes. The genesis of the policy is in the wise decision of the Congress that the continued operation of the nation's railroads is vital to a healthy economy and, therefore, that strikes over interpretations of existing agreements should be avoided. Bhd. of R. R. Trainmen v. Chicago River & I. R. Co., 353 U.S. 30, 35–41, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957).

Conversely, Congress also recognized in Section 8 of the Norris-LaGuardia Act (29 U.S.C. § 108) that unions should have a right to strike when necessary to secure the rights of their members or to improve their lot. Thus, while the Supreme Court has upheld the issuance of injunctions against strikes in minor disputes, it has refused to uphold them in major disputes. Bhd. of R. R. Trainmen v. Toledo, P. & W. R. Co., 321 U.S. 50, 66, 64 S.Ct. 413, 88 L.Ed. 534 (1944); Elgin, J. & E. Ry. Co. v. Burley, 325 U.S. 711, 725–727, 65 S.Ct. 1282, 89 L.Ed. 1886, (1945); *Chicago River, supra* at 42, 77 S.Ct. 635.; Order of R. R. Telegraphers v. Chicago & N. W. Ry. Co., 362 U.S. 330, 341, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960); Bhd. of Locomotive Engrs. v. Baltimore & Ohio R. Co., 372 U.S. 284, 288–289, 83 S.Ct. 691, 9 L.Ed.2d 759 (1963); and Bhd. of Ry. & SS. Clerks v. Florida East Coast Ry. Co., 384 U.S. 238, 243–244, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966). The latest case cited also recognizes that carriers may resort to self-help in major disputes.

Because of the differences in rights and procedures, the distinction between major and minor disputes is of crucial importance. In Elgin, J. & E. Ry. Co. v. Burley, the court noted that the Railway Labor Act distinguishes the two types of disputes in Section 2 (45 U.S.C. § 152). The court held, 325 U.S. at 722–723, 65 S.Ct. at 1289:

The statute first marks the distinction in § 2, which states as among the Act's five general purposes: "(4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt

---

1. E. g., whether the switching operation in the instant case constitutes a "run."

and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." The two sorts of dispute are sharply distinguished, though there are points of common treatment. Nevertheless, it is clear from the Act itself, from the history of railway labor disputes and from the legislative history of the various statutes which have dealt with them, that Congress has drawn major lines of difference between the two classes of controversy.

The first relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

The second class, however, contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement, e. g., claims on account of personal injuries. In either case the claim is to rights accrued, not merely to have new ones created for the future.

In general the difference is between what are regarded traditionally as the major and the minor disputes of the railway labor world. * * * [Notes omitted.]

Thus, a minor dispute is one which necessarily requires an actual application or interpretation of an existing agreement and set of facts for its resolution. An "application" of the agreement means that the facts create an issue as to whether or not the agreement controls the resolution of a highly particularized dispute. An "interpretation" of the agreement means that an issue exists as to the meaning of the agreement.

Neither an application nor an interpretation is required under the facts of this case. There is no dispute as to the facts so there is no reason for an application of any agreement. Since the only alleged dispute between the parties is over a decision of a Court of Appeals (as will be shown below), there is no necessity for interpreting any agreement.

In the *Chicago River* case, the Court also noted the distinction between Sections 2, Sixth, and 2, Seventh, characterizing the latter as applicable to a major dispute. *Supra* at 33. Section 2, Seventh (45 U.S.C. § 152, Seventh) prohibits a carrier from unilaterally changing "the rates of pay, rules or working conditions of its employees, as a class" except in accordance with the bargaining procedures in the Act or those in agreements between the parties. In the *Florida East Coast* case, the Court cited with approval the holding in Florida East Coast Ry. Co. v. Bhd. of R. R. Trainmen, 336 F.2d 172, 179–180 (5th Cir. 1964), cert. denied, 379 U.S. 990, 85 S.Ct. 703, 13 L.Ed.2d 611, that unilateral changes in working conditions may constitute a major dispute where they amount to an abrogation of the existing agreement. 384 U.S. at 242, 86 S.Ct. 1420.

In the instant case, the carrier unilaterally instituted an important change in the agreement in force by refusing to use a fireman on the newly created "84 inch Hot Strip Mill run." It is not necessary for a party to seek a new agreement for there to be a major dispute. It is sufficient for there to be a unilateral change in the prior agreement

which, as here, has the effect of creating a new agreement.

The carrier here has argued that it is only acting in accord with the existing agreements. In this regard, it is important to note that the carrier agrees that the decisions in Bhd. of R. R. Trainmen v. Akron & B. B. R. Co., 385 F.2d 581 (D.C.Cir. 1967), cert. denied, 390 U.S. 923, 88 S.Ct. 851, 19 L.Ed.2d 983 (1968), are *res judicata* between these parties. The Supplemental Opinion of the Court of Appeals in that case, 385 F.2d at 607, shows that the carrier's unilateral action was in violation of the Railway Labor Act and is not based on any existing agreement. In that opinion, it was held, 385 F.2d at 611–612:

*The National Diesel Agreement was not set aside by the Board. As already noted, the opening section of the Award provided that agreements in force continued in effect except as they were modified by the Award.* The Award provided a procedure for modifications during the two-year life of the Award. We recognize that it may be turning back the clock to an era that two presidential boards and the Neutral Members of Board 282 have agreed is technologically outdated, but taking into account the structure of Award 282 as issued, *we see no alternative to holding that any new runs created after Award 282 are subject to the National Diesel Agreement, and its requirement of a fireman on each engine crew.*

*Moreover, the National Diesel Agreement is in effect even though the only reason why a change in its work rule was not made under the Award during its life time was the fact that the change was blocked by a state's full crew law.* The Supreme Court has expressly held that while such state law was in effect the Board had no capacity to make a change contrary to its provisions. See Brotherhood of Locomotive Engineers v. Chicago, Rock I. & Pac. R. R., 382 U.S. 423, 86 S.Ct. 594, 15 L.Ed.2d 501 (1966). The opening sections of the Award dealing with the use of firemen and with crew consists provided for the continuation of work rules, however established, unless changed pursuant to the Award. The repeal of a full crew law subsequent to the expiration of Award 282 came after expiration of the Board's authority under the temporary statute and after expiration of the power of a carrier to invoke the procedures of the Award.

The carriers argue in effect that the Award at least authorized the carriers to blank firemen positions during the lifetime of the Award, with this personnel action remaining in a state of suspended animation until its vitalization upon repeal of the full crew law. The Court noted in Rock Island, *supra,* 382 U.S. at 433, 86 S.Ct. at 599:

Congress wanted to do as little as possible in solving the dispute which was before it, and we note that this dispute was not over the size of crews in States which had full-crew laws.

The Board authorized the carriers to list jobs for blanking, and thus provide a classification "when and if such full crew laws are amended or repealed." Answer of May 17, 1964, to Carriers' Question No. 5 under Section II—Part B(1) and B(2). *But this conditional blanking was only available as an advance procedure made fruitful if the necessary condition materialized during the 2-year lifetime of the Award.* See Opinion of Neutral Members, quoted *supra,* 41 Lab.Arb. at 681. The Board's energy was not limited to "the dispute which was before it [Congress]" at the passage of the law, but also extended to firemen manning disputes arising during the critical 2-year period. But the Board's order and interpretations cannot be stretched beyond the Congressional frame of reference to resolve academic differences or disputes that were neither in being

at the time nor projected as arising during the 2-year period. [Emphasis added.]

As it is conceded that the carrier's attack on Indiana's Full Crew Law (Burns' Ind. Stat.Ann. §§ 55–1330 and 55–1331) failed and the law was not repealed during the life of Award 282, then the 1950 National Diesel Agreement was and is in effect between these parties. This is due to the fact that the condition precedent for a change in that Agreement by Award 282, i. e., the repeal of the Full Crew Law, never came to pass.

The carrier tries to quibble with the phrase "new runs" as used in the above-quoted portion of the *Akron* decision. The carrier would confuse this Court and have it believe that the word "run" is a word of art in the railroad industry. Firstly, it must be remembered that the word appears in an opinion of a Court of Appeals and not in a railroad agreement. Thus, the NRAB has no special competence to define its meaning.

Secondly, the word was used in a well-known meaning. Its sense is that given in Webster's New International Dictionary (2d Ed.) at 2185:

run, n. * * * 7. The distance or extent of territory covered or to be covered, * * *, during a special course, time or operation; the ship's *run* was only 300 miles; * * *; an engineer's *run*.

The court in *Akron* was simply saying that when a new assignment[1] comes into being, the National Diesel Agreement would regulate the use of firemen.

Whether this applies to new assignments which are modifications of existing ones is not material here. As shown by carrier's agreement of August 9, 1967, with the Brotherhood of Locomotive Engineers, this was a completely new assignment for this carrier. That agreement states (Plaintiff's Appendix 8–9):

To enable the Carrier to be competitive and handle certain intraplant work associated with the steel manufacturing process at the 84″ Hot Strip Mill of the Gary Sheet & Tin Works, it is agreed:

1. An assignment known as the *"84″ Hot Strip Mill" Assignment may be established* to perform intraplant work *not now performed by EJ&E crews:*

2. The work of this assignment will include the switching of Yard P, servicing the 84″ Hot Strip Mill, and related intraplant switching *not now performed by EJ&E crews at the 84″ Hot Strip Mill and at other new plants and facilities that may be added in the future* at the Gary Sheet & Tin Works.[2]

Moreover, in his testimony before the court below, James Shimeall, carrier's Labor Relations Counsel, admitted that the 84 inch Hot Strip Mill was first serviced by carrier

* * * when the *new* plant went into operation. *It was a brand new facility, the first time it went into full operation.* [Defendant's Appendix 50. Emphasis added.]

Carrier's argument on the definition of "new" runs does not appear to me to have been made in good faith.

1. The word "assignment" is virtually synonymous with the Webster definition of "run." "Assignment," in the railroad industry has attained the status of a word of art. Operating employees (engineers, firemen, brakemen, etc.) bid for their particular positions on the basis of seniority. The bids are solicited by way of a "bulletin" which describes the area or territory to be covered, the work to be performed (switching, road freight, passenger, etc.), the starting time and estimated completion time of the trip, the location for starting ("on duty") and completion ("tie-up") for each crew member, and the days on which the position will work. The "assignment" is defined by the bulletin description.

2. Emphasis added. It is also important to note that the word "establish" is used in the railroad industry only in connection with new assignments.

The last argument raised by carrier is that a stipulation it entered into with the Brotherhood here constituted an agreement as to new work rules under Award 282. The unrebutted testimony of Charles Mellen, the Brotherhood's General Chairman, showed that the stipulation was a temporary job-protection device for the benefit of firemen put out of work by the state court's decision in the carrier's challenge to Indiana's Full Crew Law. It provided alternate employment to firemen pending disposition of an appeal to the Indiana Supreme Court, which held against the carrier. Defendant's Appendix 19, 40. That the stipulation was not a permanent change is shown by further testimony of Shimeall in which he admitted that carrier's sole reliance was placed on its contention that Award 282 modified the National Diesel Agreement. At Defendant's Appendix 51, Shimeall stated:

I then recall that the conversation came up that he thought we had to have firemen on here, and the conversation then went along the line—I advised him that we had gone through this before in regard to the hot cinder and hot metal runs whereby *it was the carrier's contention that our Diesel Agreement had been modified by Award 282,* and that they were fighting that battle or had a complaint against the Public Service Commission of Indiana, and *I advised him that if he or they won their case before the Commission, that, of course, we would have to have firemen—put firemen on these assignments.* [Emphasis added.]

Thus, this defense also does not appear to have been made in good faith.

For the foregoing reasons, I am unable to find any good faith defense on the part of the carrier which is based on any existing agreement. I believe that carrier unilaterally changed the existing working conditions contained in the National Diesel Agreement in violation of the Railway Labor Act. Accordingly, I would reverse the judgment below and remand for further proceedings.